**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ANTWAIN BAILEY, | ) | |
| | ) | |
| Plaintiff, | ) | 08 C 4441 |
| | ) | |
| vs. | ) | Honorable Judge |
| | ) | George Marovich |
| CITY OF CHICAGO, et al | ) | |

<u>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR**</u>
<u>**SUMMARY JUDGMENT**</u>

NOW COME the DEFENDANTS, COOK COUNTY, JAMES KAPOTAS, YAN YU and BARBARA DAVIS, by their attorney, ANITA ALVAREZ, Cook County State's Attorney, and through her Assistants, KEVIN FREY and MAUREEN HANNON, and submits this Memorandum of Law in support of their Rule 56 Motion for Summary Judgment:

<u>**INTRODUCTION**</u>

Antwain Bailey ("Plaintiff") brings this action under the Civil Rights Act, 42 U.S.C. § 1983.  Plaintiff alleges that Defendants Yan Yu, James Kapotas and Barbara Davis showed deliberate indifference to his serious medical needs by refusing to provide medical care to Plaintiff.  (56.1(a) ¶ 7).  Plaintiff alleges that Defendant Cook County showed deliberate indifference to his serious medical needs through its customs, policies and practices.  (56.1(a) ¶ 10).  The above named Defendants bring this motion pursuant to Rule 56 of the Federal Rules of Civil Procedure as there is no genuine issue of material fact, and the undisputed facts demonstrate that they are entitled to judgment as a matter of law.

1

## STATEMENT OF FACTS

On August 7, 2006, Plaintiff suffered a grade 2 open tibia and fibula fracture to his right leg when the motorcycle he was driving struck a Chicago Police Department squad car causing Plaintiff to be thrown off the motorcycle and land on the cement. (56.1(a) ¶ 12).  Plaintiff was placed under arrest by the Chicago Police for unlawful use of a weapon and possession of a stolen motor vehicle and transported to Christ Hospital for treatment.  (56.1(a) ¶ 13).  Plaintiff was hospitalized at Christ Hospital from August 7, 2006 to August 11, 2006 where he received medical treatment for his injuries including multiple surgeries, medication, and a metal rod was put in his leg.  (56.1(a) ¶¶ 15-17).

From August 11, 2006 to August 15, 2006, Plaintiff was housed in the infirmary on Wing 3 West Wing at the Cook County Department of Corrections ("CCDOC") where he received medication and was examined by the medical staff.  (56.1(a) ¶¶ 22-24).  On August 15, 2006, Dr. Yu discharged the Plaintiff to the Residential Treatment Unit (RTU) which was a separate division of the jail.  (56.1(a) ¶ 25).  This discharge included a prescription for the medications Keflex and Motrin, crutches and a referral to the orthopedic clinic.  *Id*.

Sometime on or after August 16, 2006, a cast was put on Plaintiff's right leg by orthopedic technicians. (56.1(a) ¶ 31).  Plaintiff was seen in the RTU by Dr. DeFuniak on August 30, 2006 and Dr. DeFuniak observed that Plaintiff's cast was wet and had a foul odor.  (56.1(a) ¶ 32).  Plaintiff related that he had gotten the cast wet, so Dr. DeFuniak made a referral to the orthopedic clinic.  *Id*.  Plaintiff was seen again by Dr. DeFuniak on August 31, 2006 and he was also seen that day by Physician's Assistant ("P.A.") Barbara Davis and Dr. Kapotas in the orthopedic clinic.  (56.1(a) ¶ 33).  P.A. Davis removed

Plaintiff's cast, noted that there was necrotic tissue and a foul odor coming from Plaintiff's right leg and believed Plaintiff needed to be transferred to Stroger Hospital for further medical treatment.  (56.1(a) ¶ 34).  Dr. Kapotas examined Plaintiff's leg after his cast was removed and observed an apparent infection at the wound site that would require an irrigation and debridement surgery.  (56.1(a) ¶ 35).  Plaintiff was transported to Stroger Hospital that evening.  (56.1(a) ¶ 37).

Plaintiff was diagnosed with osteomyelitis which is an infection of the bone. (56.1(a) ¶ 38).  Between September 1, 2006 until February 14, 2007, Plaintiff received multiple surgeries, medications and forms of treatment at Stroger Hospital and the CCDOC for his osteomyelitis.  (56.1(a) ¶ ¶ 37, 40-42, 44-53, 55-57, 59-60).  Even with these multiple forms of treatment, Plaintiff's osteomyelitis kept coming back.  (56.1(a) ¶ 61).  After Dr. Kapotas explained to Plaintiff his treatment options, Plaintiff chose to have his right leg amputated because he wanted the option that would guarantee the osteomyelitis would not come back.  (56.1(a) ¶ ¶ 63-64).  On February 14, 2007, Dr. Kapotas performed a successful below the knee amputation amputated of Plaintiff's right leg.  (56.1(a) ¶ 65).

## SUMMARY JUDGMENT STANDARD OF REVIEW

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In ruling on a motion for summary judgment, the evidence of the nonmovant must be believed and all justifiable

inferences must be drawn in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

"[T]he district court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Winters v. Fru-Con Inc.*, 498 F.3d 734, 744 (7th Cir. 2007). A party who will bear the burden of proof on a particular issue at trial may not rest on the pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact, which requires trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). There is no issue for trial "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249.

"The primary purpose of a motion for summary judgment is to avoid a useless trial." *Mintz v. Mathers Fund, Inc.*, 463 F.2d 495, 498 (7th Cir. 1972). The undisputed facts clearly establish that Defendants were not deliberately indifferent to Plaintiff's alleged serious medical need. Thus, Defendants respectfully submit that they are entitled to judgment in their favor as a matter of law.

## ARGUMENT

### I. DEFENDANTS YAN YU, JAMES KAPOTAS AND BARBARA DAVIS WERE NOT DELIBERATLY INDIFFERENT TO THE PLAINTIFF'S MEDICAL CONDITION

The constitutional violations set forth in Count I of Plaintiff's Third Amended Complaint are that Defendants Davis, Kapotas and Yu refused to obtain and provide proper medical treatment for Plaintiff despite Plaintiff's repeated requests for medical assistance, thus making them deliberately indifferent to Plaintiff's serious medical needs. (56.1(a) ¶ 7). This Court should grant Defendant's Motion for Summary Judgment

4

because the facts clearly establish that Plaintiff received prompt and adequate treatment for his right leg from not only the Defendants, but other Cermak medical personnel.

The Eighth Amendment's prohibition against cruel and unusual punishment extends to pretrial detainees under the Due Process Clause of the Fourteenth Amendment. *See Zentmyer v. Kendall County*, 220 F. 3d 805, 810 (7th Cir. 2000); *quoting Estelle v. Gamble*, 429 U.S 97, 104 (1976). Thus, in order to maintain this cause of action, Plaintiff must establish that the Defendants violated the Eighth Amendment by denying the Plaintiff humane conditions of confinement in the form of demonstrating "deliberate indifference to serious medical needs of prisoners." *Farmer v. Brennan*, 511 U.S. 825 (1994). In order for the Plaintiff to state a cause of action against the Defendants under 42 U.S.C. § 1983, they must allege that the Defendants caused or participated in the alleged constitutional deprivation. *McBride v. Soos*, 679 F.2d 1223, 1227 (7th Cir. 1982). Therefore, the Defendants can only be held liable in their individual capacities if, by their own conduct, they caused or participated in the alleged constitutional violations. *Armstrong v. Squadrito*, 152 F.3d 564, 581(7th Cir. 1998), *citing Duckworth v. Franzen*, 780 F.2d 645, 649 (7th Cir. 1985), *cert. denied*, 419 U.S. 816 (1986).

The term "deliberate indifference" describes a state of mind, which holds a higher standard of blameworthiness than negligence. *Farmer*, 511 U.S. at 835. Only "deliberate indifference to serious medical needs of prisoners" is a violation of the Cruel and Unusual Punishment Clause, and Eighth Amendment liability requires more than "ordinary lack of due care" for inmates' safety or welfare. *Farmer*, 511 U.S. at 837. To prevail on a constitutional claim for failure to provide medical care, a pretrial detainee must satisfy both an objective and subjective element. *Id*. at 834.

5

First, to satisfy the objective element of the deliberate indifference analysis, the Plaintiff must show that the deprivation alleged was a "sufficiently serious" injury or medical need. *Farmer,* 511 U.S. at 834. A serious injury or medical need is one that is so obvious that even a layperson would easily recognize that it requires a doctor's attention. *Chapman v. Keltner*, 241 F. 3d 84, 85 (7th Cir. 2001). Based on the fact that the Plaintiff was examined by a doctor multiple times, underwent multiple surgeries, received multiple forms of treatment, received x-rays, and prescription medication, it does appear that there is a question of fact as to whether the Plaintiff suffered from a serious medical condition.

Even if there is no question of fact regarding the seriousness of the Plaintiff's medical condition, the Plaintiff must also satisfy the subjective component by showing that the Defendants were deliberately indifferent to his medical needs in order to survive summary judgment. *Zentmyer v. Kendall County*, 220 F. 3d 805, 810 (7th Cir. 2000). To prove the subjective element of deliberate indifference of his medical needs, Plaintiff must be able to show that the defendants actually realized that there was a serious harm and knowingly refused to do anything to alleviate it. *Campbell v. Greer*, 831 F.2d 700, 702 (7th Cir. 1987). The defendant must be "aware of the facts from which an inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Deliberate indifference means "subjective awareness" and it is "not enough that the defendant *ought* to have recognized the risk." *Riccardo v. Rausch*, 359 F.3d 510 (7th Cir. 2004).

The court in *Farmer* analogized deliberate indifference to criminal recklessness. *Farmer*, 511 U.S at 838. "An act is reckless in the pertinent sense when it reflects

complete indifference to risk-when the actor does not care whether the other person lives or dies, despite knowing that there is a significant risk of death." *Archie v, City of Racine*, 847 F. 2d 1211, 1219 (7ᵗʰ Cir. 1988)(*en banc*). "[T]he official must be both aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Farmer*, 511 U.S. at 837. Mere negligence or even gross negligence does not amount to deliberate indifference. *Archie*, 847 F.2d at 1219. Therefore, it is insufficient to show that the Defendants merely failed to act reasonably to Plaintiff's serious health concerns. *McGill v. Duckworth*, 944 F. 2d 344, 349 (7ᵗʰ Cir. 1991).

The question then becomes how "obvious" a risk must be, or how "erroneous" a medical professional's treatment decision must be, such that the trier of fact may infer subjective awareness of the risk in a medical treatment case. *Estate of Cole v. Fromm*, 94 F. 3d 254, 261-62 (7ᵗʰ Cir. 1996). The answer is that deliberate indifference may be inferred based upon a medical professional's erroneous treatment decision only when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a professional judgment. *Estate of Cole*, 94 F. 3d at 262.

Conversely, deliberate indifference is not shown merely by proving an incorrect diagnosis, *Steele v. Choi*, 82 F. 3d 175, 178-79 (7ᵗʰ Cir. 1996), negligent treatment, *Walker v. Benjamin*, 293 F. 3d 1030, 1037 (7ᵗʰ Cir. 2002), or a disagreement over the best course of treatment. *Gil v. Reed*, 381 F. 3d 649, 663 (7ᵗʰ Cir. 2004); *Snipes v. DeTella*, 95 F.3d 586, 592 (7ᵗʰ Cir. 1996) (inmate's disagreement with doctor's chosen course of treatment does not amount to deliberate indifference). An inmate in need of medical

treatment does not have a constitutional right to demand a particular type of treatment if some other treatment option is available. *See Forbes v. Edgar*, 112 F. 3d 262, 267 (7th Cir. 1997) (inmate not entitled to demand either specific care or the best care possible). A mere difference of opinion among medical personnel regarding a patient's appropriate treatment does not give rise to a deliberate indifference claim. *Estate of Cole,* 94 F.3d at 261. A court "must examine the *totality of an inmates' medical care* when considering whether that care evidences deliberate indifference to his serious medical needs." *Gutierrez v. Peters*, 111 F.3d 1364, 1375 (7th Cir. 1997) (emphasis added).

Plaintiff alleges that had he received care from Dr. Yu, Dr. Kapotas and PA Davis, his infection would have been controlled and he would not have needed an amputation. (56.1(a) ¶¶ 8-9). The timeframe at issue in this case is the two week period when Plaintiff was housed in the Residential Treatment Unit ("RTU") from August 15, 2006 to August 31, 2006. (56.1(a) ¶ 11). If a plaintiff alleges that a defendant was deliberately indifferent based upon a delay of medical treatment, "the relevant question is whether the delay in access to treatment was so unreasonable under the circumstances as to suggest deliberate indifference." *Brown v. Briick,* 1995 U.S. Dist. LEXIS 5930 at *7 (N.D. Ill. May 3, 1995) (Nordberg, J.). The Seventh Circuit has found that a plaintiff who complains that a "delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Langston v. Peters,* 100 F.3d 1235, 1240 (7th Cir. 1996), *quoting Beyerbach v. Sears,* 49 F.3d 1324, 1326 (8th Cir. 1995). There is no evidence in the record to support the notion that any alleged delay was detrimental.

### A.     Yan Yu

Plaintiff alleges he requested medical treatment from Dr. Yu on multiple occasions and Dr. Yu refused to provide medical care to him.  (56.1(a) ¶ 7)  Specifically, Plaintiff alleges that if he had received medical attention from Dr. Yu while he was under Dr. Yu's care, his infection would have been controlled and his right leg would not have been amputated.  (56.1(a) ¶ 8).  The undisputed facts demonstrate that Dr. Yu was not deliberately indifferent to Plaintiff's medical condition.

Dr. Yu first saw Plaintiff on 3 West on August 14, 2006.  On both August 14 and 15, 2006, Dr. Yu examined Plaintiff, ordered x-rays, made a referral to the orthopedic clinic, prescribed medication, prescribed crutches, and transferred Plaintiff to the RTU.  (56.1(a) ¶¶ 24-25)  Dr. Yu discharged Plaintiff from 3 West to the RTU because the care Plaintiff needed could be given to him in the RTU.  (56.1(a) ¶¶ 25-26)  At the time of Plaintiff's discharge to the RTU on August 15, 2006, Plaintiff showed no signs of infection and was not suffering from any pain, swelling or discharge from his leg.  (56.1(a) ¶ 23)  Even when Plaintiff returned to 3 West in October and December of 2006, he was examined by Dr. Yu and Dr. Yu wrote prescriptions, consultations and referred Plaintiff for x-rays.  (56.1(a) ¶¶ 46-48, 56-57)  When one looks at the totality of care provided to Plaintiff by Dr. Yu, the undisputed facts demonstrate that Dr. Yu did not act with deliberate indifference towards Plaintiff.

Plaintiff also claims that Dr. Yu had supervisory authority over Cermak Health Services, and because of this authority, Dr. Yu should have made an attempt to ensure that Plaintiff received an orthopedic consultation.  (56.1(a) ¶ 8).  However, Dr. Yu was not a supervisor and did not have supervisory authority over Cermak Health Services.

Dr. Yu was the primary care physician in the infirmary which was located on the third floor of the Cermak building. (56.1(a) ¶ 4). Once Plaintiff was transferred to the RTU, he was under the care of the primary care physician in the RTU. (56.1(a) ¶¶ 25, 29). There is no evidence supporting the notion that Dr. Yu had an obligation to follow up on Plaintiff's care once Plaintiff was discharged from the infirmary and under the care of the RTU physician.

Even if Dr. Yu could be considered a supervisor, any failure to follow-up on his consultation did not amount to deliberate indifference. Vicarious liability is insufficient to hold an employer or supervisor responsible merely because of his position. *Monell v. New York City Department of Social Services*, 436 U.S. 658, 692, 90 S. Ct. 2018, 2036 (1978). It is well settled that that mere supervisory status does not create liability in § 1983 action. *Zimmerman v. Tribble*, 226 F.3d 568, 574 (7th Cir. 2000). To apply supervisor liability, the plaintiff must provide evidence demonstrating the supervisor's personal involvement in the unconstitutional activities of his subordinates. *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988). At a minimum, the Plaintiff must allege the Defendants' knowledge and consent to the subordinate's actions. *Jones,* 856 F.2d at 992.

Dr. Yu believed that Plaintiff needed an orthopedic consultation and submitted the referral. (56.1(a) ¶ 25). At the time the referral was submitted, Plaintiff was not experiencing any loss of feeling, discharge from the wound and there was no smell coming from the wound. (56.1(a) ¶ 23). It was reasonable for Dr. Yu to believe that Plaintiff would be seen in the orthopedic clinic and if not, that the primary care physician in the RTU would follow up if necessary. *See Johnson v. Snyder, 444 F. 3d 579, 586* (7th

Cir. 2006)(The Seventh Circuit found that the defendant did not exhibit deliberate indifference when he believed his subordinates were attending to the medical issues of the plaintiff). Thus, judgment should be entered on behalf of Dr. Yu because there is no basis to find that Dr. Yu violated Plaintiff's constitutional rights.

### B.    Dr. Kapotas

Plaintiff claims that despite his many requests for medical treatment, Dr. Kapotas refused to provide medical treatment to Plaintiff. (56.1(a) ¶¶ 7, 9). Plaintiff alleges that Dr. Kapotas refused to provide him with an orthopedic consultation on August 16, 2006. (56.1(a) ¶ 9). Plaintiff contends, had this consultation been given, his infection would have been controlled and there would have been no need for an amputation. *Id.* The evidence does not support these allegations.

Dr. Kapotas is employed by Cook County as a physician at John Stroger Hospital who specializes in orthopedics. (56.1(a) ¶ 6) Back in 2006, Dr. Kapotas also worked in the orthopedic clinic at the Cook County Jail on Thursdays with Barbara Davis. *Id.* Dr. Kapotas could not have refused to see Plaintiff on August 16, 2006 as he alleges because that was a Wednesday and on Wednesdays Dr. Malk and Harry Preskopf worked in the orthopedic clinic. (56.1(a) ¶ 30) The first time Dr. Kapotas saw Plaintiff was on Thursday, August 31, 2006. (56.1(a) ¶ 33) Having not seen Plaintiff prior to August 31st, Dr. Kapotas could not have been the cause or contributed to Plaintiff's claimed injuries. Plaintiff never testified that Dr. Kapotas refused to see him or denied him medical treatment.

Moreover, even if there was evidence that Dr. Kapotas refused to see Plaintiff on August 16, 2006, there is no verifying medical evidence to demonstrate that such a delay

caused Plaintiff's osteomyelitis. The most likely cause of Plaintiff's infection was his exposed broken bone coming into contact with the elements during the early morning hours of August 7, 2006 at the time of his accident. (56.1(a) ¶ 39). There were signs that Plaintiff's wound was infected while Plaintiff was still at Christ Hospital. (56.1(a) ¶ 17). In addition, Plaintiff was seen sometime around August 16, 2006, because he had his wrap removed and a cast placed on his right leg. (56.1(a) ¶ 31). Thus, any alleged delay on the part of Dr. Kapotas did not cause Plaintiff's osteomyelitis.

Even if Plaintiff's allegations could extend to his treatment starting August 31, 2006, the record is clear Dr. Kapotas was not deliberately indifferent to Plaintiff's medical needs. Dr. Kapotas examined Plaintiff on August 31, 2006 and determined that he needed to be transported to Stroger Hospital for surgery and further treatment. (56.1(a) ¶ 35). During each of his three stays at Stroger Hospital, there is no dispute that Plaintiff received treatment which included multiple surgeries, medication, and other forms of treatment. (56.1(a) ¶¶ 37, 40-42, 50-53, 59-60). Dr. Kapotas, along with the team of orthopedic doctors at Stroger, used different forms of treatment to not only control the osteomyelitis, but also to help Plaintiff's fractured leg heal. *Id.* The totality of care provided to Plaintiff indicates that there was no deliberate indifference on the part of Dr. Kapotas.

Contrary to what was alleged in Plaintiff's Third Amended Complaint, Plaintiff's leg did not need to be amputated. (56.1(a) ¶ 64). Dr. Kapotas used multiple methods and strategies to try and control Plaintiff's osteomyelitis, however, Plaintiff's osteomyelitis kept coming back. (56.1(a) ¶¶ 37, 40-42, 50-53, 59-60, 64) Plaintiff was going to live with the osteomyelitis the rest of his life, but Plaintiff was getting frustrated and wanted

to know what his other treatment options were. (56.1(a) ¶¶ 38, 61). Dr. Kapotas explained to Plaintiff the other treatment options which included bone transport surgery. (56.1(a) ¶¶ 61-62). Plaintiff told Dr. Kapotas that he wanted medical treatment that would completely eliminate the osteomyelitis and Dr. Kapotas explained that the only option that would guarantee that the osteomyelitis would not come back was amputation. (56.1(a) ¶ 61). The evidence demonstrates that Dr. Kapotas did not take the option of amputation lightly because other options were given to Plaintiff, amputation was discussed with Plaintiff on multiple occasions, Plaintiff was given time to change his mind, Plaintiff consulted with family members and ultimately Plaintiff consented to the amputation. (56.1(a) ¶¶ 61-65). Plaintiff cannot point to any evidence that establishes that Dr. Kapotas told Plaintiff that he needed to have his leg amputated or that Plaintiff was forced to have an amputation. Based on the foregoing reasons, Dr. Kapotas is entitled to judgment as a matter of law.

### C. Barbara Davis

Plaintiff's Third Amended Complaint contends that P.A. Barbara Davis refused to provide medical treatment for Plaintiff despite his repeated request. (56.1(a) ¶ 7). The only factual allegation in his complaint about P.A. Davis was that she refused to provide him with an orthopedic consultation on August 16, 2006. (56.1(a) ¶ 9). Plaintiff contends, had this consultation been given, his infection would have been controlled and there would have been no need for an amputation. *Id.* The evidence demonstrates that P.A. Davis was not working in the orthopedic clinic on August 16, 2006 and that when she did see Plaintiff on August 31, 2006, her conduct was anything but deliberately indifferent.

13

It was not possible for P.A. Davis to refuse to see Plaintiff on August 16, 2006, because she was not working in the orthopedic clinic that day. P.A. Davis only worked in the orthopedic clinic on Thursdays with Dr. Kapotas. (56.1(a) ¶¶ 5, 30). August 16, 2006 was a Wednesday, so P.A. Davis was not in the orthopedic clinic that day. (56.1(a) ¶ 31). The individuals that would have working in the clinic that day were Dr. Malk and P.A. Harry Preskopf. (56.1(a) ¶ 30). As P.A. Davis testified to, the only time she saw Plaintiff between August 7, 2006 and February 14, 2007, was on August 31, 2006 in the orthopedic clinic. (56.1(a) ¶ 5). August 31, 2006 was a Thursday and she was working with Dr. Kapotas that day. (56.1(a) ¶¶ 33-35).

When P.A. Davis saw Plaintiff, she asked about his complaints and conducted an examination. (56.1(a) ¶ 34). Realizing that there may be a problem with Plaintiff's wound, P.A. Davis cut the cast off Plaintiff's leg. *Id.* She examined his leg and observed necrotic tissue around the wound which would most likely require surgery. *Id.* Surgeries could not be performed at Cermak, thus, Plaintiff needed to be sent to Stroger to get the appropriate medical care. (56.1(a) ¶ 36). P.A. Davis had Dr. Kapotas examine Plaintiff's leg and he was in agreement that Plaintiff needed to go to Stroger for surgery. (56.1(a) ¶ 35). In concert with Dr. Kapotas, P.A. Davis referred Plaintiff to Stroger Hospital that same evening for treatment on his leg. (56.1(a) ¶¶ 34-35). The undisputed facts are clear that P.A. Davis never refused to obtain or provide medical treatment for Plaintiff. Because Barbara Davis provided medical treatment to Plaintiff the one time she saw him between August 7, 2006 and February 14, 2007, judgment as a matter of law should be entered in her favor as well.

## II. DEFENDANTS YAN YU, JAMES KAPOTAS AND BARBARA DAVIS ARE ENTITLED TO QUALIFIED IMMUNITY

Dr. Yu, Dr. Kapotas and P.A. Davis are entitled to judgment as a matter of law based upon qualified immunity. Qualified immunity protects public officials who perform discretionary functions from liability and from suit for actions that do not violate clearly established constitutional law. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The United States Supreme Court has set forth a two-step inquiry to determine whether a government official is entitled to qualified immunity. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); see also *Akande v. Grounds*, 555 F. 3d 586, 589-90 (7th Cir. 2009). First, a court must decide whether the facts alleged by the plaintiff set forth a violation of a constitutional right. If the facts show that the conduct did not violate a clearly established constitutional right, immunity applies and the court need not proceed to the second step. *Saucier*, 533 U.S. at 202; *Akande*, 555 F.3d at 590. If the plaintiff establishes the first prong, the court must determine whether the right was "clearly established at the time of the defendant's alleged misconduct." *Akande*, 555 F.3d at 590.

In the case at bar, as argued above, none of the Defendants violated Plaintiff's constitutional rights. Instead, each Defendant acted reasonably given the circumstances. Therefore, the resolution of the first prong is dispositive. Dr. Yu examined Plaintiff, followed the discharge instructions from Christ Hospital, made an orthopedic referral and properly discharged Plaintiff to the RTU. (56.1(a) ¶¶ 24-25). While Plaintiff was in the RTU, he was no longer under the care of Dr. Yu. (56.1(a) ¶¶ 25, 29). Therefore, Dr. Yu reasonably relied upon other Cermak medical personnel to ensure Plaintiff received an orthopedic consultation.

Plaintiff was not presented to Dr. Kapotas or P.A. Davis until August 31, 2006.

(56.1(a) ¶ 33). When presented, both Dr. Kapotas and P.A. Davis examined Plaintiff, determined that Plaintiff was in need of care that could not be provided to him at CCDOC and immediately sent him over to Stroger Hospital. (56.1(a) ¶¶ 34-36). Furthermore, Dr. Kapotas was one of the orthopedic specialists who provided treatment to Plaintiff during each of his trips to Stroger Hospital. (56.1(a) ¶ 37, 40-42, 50-53, 59-60, 64). Both Dr. Kapotas and P.A. Davis took the appropriate, necessary actions and did not violate Plaintiff's constitutional rights. Thus, all three Defendants are entitled to a judgment as a matter of law based upon qualified immunity.

### III. PLAINTIFF'S *MONELL* CLAIM AGAINST COOK COUNTY FAILS

Plaintiff alleges that Cook County violated his constitutional rights through customs, policies and practices, "whereby individuals charged with ensuring adequate health care to pre-trial detainees failed to provide access to the most basic health care." (56.1(a) ¶ 10). Plaintiff contends that these failures included (1) fostering an atmosphere where correctional and medical personnel were encouraged to disregard serious medical needs of detainees; (2) failing to adequately staff the facilities with medical personnel; (3) failing to have adequate medical intake screening procedures in place; (4) failing to adequately staff the facilities with appropriate medical specialists able to handle the medical needs of detainees with serious medical needs; (5) failing to maintain adequate medical recordkeeping practices; (6) failing to have an adequate health assessment system in place; (7) failing to have an adequate medication administration system in place; and (8) failing to have an adequate complaint and grievance system in place. (56.1(a) ¶ 10). The prompt and adequate treatment given to Plaintiff by Cermak medical personnel defeats Plaintiff's *Monell* claim against Cook County.

To establish a genuine question of fact as to whether Cook County was deliberately indifferent to Plaintiff's medical condition, Plaintiff is required to establish that Cook County had a custom or policy that contributed to the failure to provide medical care and his resulting injury. *Frake v. City of Chicago*, 210 F. 3d 779, 781 (7th Cir. 2000); *Garrison v. Burke*, 165 F. 3d 565, 571 (7th Cir. 1999). The Seventh Circuit has outlined what showing a plaintiff must make in an official capacity suit:

> Case law recognizes three ways in which a municipality's policy can violate an individual's civil rights: (1) an express policy that, when enforced, causes a constitutional deprivation, (2) a widespread practice that, although not authorized by written law or express municipal policy, is "so permanent and well settled as to constitute a 'custom or usage' with the force of law," or (3) an allegation that the constitutional injury was caused by a person with "final policymaking authority."

*McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995) (quoting, *Baxter by Baxter v. Vigo County School Corp.,* 26 F.3d 728, 735 (7th Cir. 1994))(citations omitted). More importantly, a plaintiff must demonstrate that a municipality, through its own deliberate conduct, was the moving force behind the alleged injury. *County Comm'r of Bryan County v. Brown*, 117 S. Ct. 1382, 1386 (1997); *Polk County v. Dodson*, 102 S. Ct. 445, 454(1981)(citing *Monell* at 694) "There must be an affirmative link between the policy and the particular constitutional violation alleged." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985). "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of the County Comm'rs*, 520 U.S at 410 . Deliberate indifference requires that an "official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Riccardo v.*

*Rausch*, 375 F.3d 521 (7th. Cir. 2004)(*quoting Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

Plaintiff has not set forth an express policy by Cook County that caused a constitutional violation in this case. Nor does Plaintiff allege that a person with a final decision-making authority caused Plaintiff's alleged constitutional injury. Therefore, under *Monell*, the Plaintiff must be attempting to establish a widespread practice as a basis for his *Monell* claim. In order to impute knowledge to policymakers of a widespread municipal practice, plaintiff must demonstrate a pattern of constitutional violations. *Jackson v. Marion County*, 66 F.3d 151, 152 (7th Cir. 1995). A single allegation of wrongdoing on the part of the defendant is insufficient to establish a policy, custom or practice. *Sivard v. Pulaski County*, 17 F.3d 185, 188 (7th Cir. 1994). The number of violations necessary to put a policymaker on notice will depend upon "the connection between the policymaker and the conduct which caused the injury..." *Williams v. City of Chicago*, 658 F. Supp. 147, 152 (N.D. Ill. 1987). Therefore, the further removed the violation is from the actions of the policymaker himself, the more frequent the violations necessary to show notice to the policymaker. *Id.*

Plaintiff fails to establish any "widespread practice" which could be considered an unlawful policy. Plaintiffs' allegations and the evidence do not sufficiently set forth a pattern of violations that put Cook County on notice of a problem that it was deliberately indifferent to. In fact, the evidence establishes nothing more than a single set of allegations particular to Plaintiff and directly thwart any attempt to establish a *Monell* claim against Cook County. Moreover, his allegations are not supported by the evidence.

This becomes even more evident when the evidence is compared to the eight alleged failures in health care set forth in Plaintiff's complaint.

The evidence established that when Plaintiff was transferred from Christ Hospital to the Cook County Jail, he did not go through intake screening; he went through the emergency room at Cermak, which was the standard protocol. (56.1(a) ¶ 20). The discharge instructions from Christ Hospital were followed and Plaintiff was housed on 3 West in the infirmary. (56.1(a) ¶¶ 20, 22-23). While on 3 West, Plaintiff received medications, x-rays and was examined by medical personnel. (56.1(a) ¶¶ 22-24). While in the RTU, Plaintiff received his medications and had the soft wrap on his leg replaced by a cast. (56.1(a) ¶¶ 28, 31). When Plaintiff first related a problem in regards to his cast on August 30, 2006, he was examined by Dr. DeFuniak and referred to the orthopedic clinic. (56.1(a) ¶ 32). After being seen by Dr. Kapotas and P.A. Davis the following day, Plaintiff was sent to Stroger Hospital for further medical treatment. (56.1(a) ¶¶ 33-36). Once Plaintiff was diagnosed with osteomyelitis, he received multiple forms of treatment both at Stroger Hospital and at the Cook County Jail. (56.1(a) ¶¶ 37, 40-42, 44-53, 55-57, 59-60).

All of the treatment that Plaintiff received directly contradicts his allegations that Cook County fostered an atmosphere where medical personnel were encouraged to disregard the serious medical needs of detainees, failed to have an adequate medication administration in place or failed to have adequate staff, including medical specialists, available. Moreover, any allegation involving intake screening or health assessments has no merit because Plaintiff did not come through intake screening; he was seen in the emergency room at Cermak and properly assessed. (56.1(a) ¶ 20).

Plaintiff's other allegations involving the recordkeeping and grievance systems at Cermak are also not supported by the evidence. There is no evidence that Cook County was aware of a failure in the recordkeeping practices or that any such failure contributed to Plaintiff's injury. As for the grievance system, Plaintiff failed to file any grievances or complaints regarding the medical care he received in August of 2006. (56.1(a) ¶¶ 66-70). Plaintiff knew the grievance system was in place because he filed grievances about matters unrelated to the medical care he received in August of 2006. (56.1(a) ¶¶ 67-69). There was absolutely no evidence that there were failures in these systems.

In addition, there is no evidence that any of these alleged failures were the moving force behind Plaintiff's injuries. As discussed above, the most likely cause of Plaintiff's osteomyelitis was having his bone exposed to the elements back on August 7, 2006. (56.1(a) ¶ 39). Plaintiff has not produced any verifying medical evidence that ties his condition to a delay in treatment. Because his injury was not the result of any delay in treatment, any alleged unconstitutional practice on the part of Cook County could not have been the moving force behind his injuries. Therefore, Cook County is entitled to judgment as a matter of law.

## IV. PLAINTIFF FAILED TO EXHAUST HIS ADMINISTRATIVE REMEDIES

Defendants are entitled to judgment as a matter of law because Plaintiff failed to exhaust his administrative remedies. The Prison Litigation Reform Act ("PLRA") provides that "no action shall be brought [under federal law] with respect to prison conditions . . . by a prisoner . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *Pavey v. Conley*, 544 F.3d 739, 740 (7th Cir. 2008). "To exhaust remedies, a prisoner must file complaints and appeals in the place, and at the

time, the prison's administrative rules require." *Pozo v. McCaughtry,* 286 F. 3d 1022, 1025 (7th Cir. 2002); *Dixon v. Page*, 291 F.3d 485, 490 (7th cir. 2002)(prisoner who has not appealed the dismissal of a grievance has not exhausted his administrative remedies for the purposes of § 1997e(a)). The Supreme Court has held that the failure to satisfy this requirement is an affirmative defense. *Jones v. Bock*, 549 U.S. 199, 127 S. Ct. 910, 166 L. Ed. 2d 798 (2007).

Plaintiff clearly failed to grieve the issue of his denial of proper medical care. An exhaustive search of Plaintiff's CCDOC and Cermak records revealed that Plaintiff never filed a grievance regarding the allegations in any of the complaints he filed. (56.1(a) ¶¶ 66-67). During Plaintiff's incarceration at CCDOC, Plaintiff filed three grievances, which demonstrates that he was aware of the process. (56.1(a) ¶¶ 66, 68-70) Plaintiff filed one grievance regarding his placement in the RTU instead of the infirmary. (56.1(a) ¶ 68). The other two grievances Plaintiff filed were in regard to the failure to see a doctor in April and May of 2007, which was approximately nine months after the actions at issue here. (56.1(a) ¶¶ 68-69). All three of these grievances were filed after Plaintiff's right leg had been amputated and did not involve a denial of proper medical care by any medical personnel which formed the basis for his Third Amended Complaint. (56.1(a) ¶ 67). Plaintiff had an opportunity to file such a grievance relative to the claims advanced in the case at bar and chose not to do so, having filed no other grievances. (56.1(a) ¶ 66). Even if the Plaintiff could make an argument that the grievances he filed relate to the allegations in his Third Amended Complaint, Plaintiff failed to appeal the decisions on these grievances and thus, failed to exhaust his administrative remedies. (56.1(a) ¶ ¶ 68-70).

Having entirely avoided the grievance procedure on the issues which are the subject of this litigation, Plaintiff attempted to prevent a prompt investigation into the basis for the grievance and prevented the gathering and preservation of evidence. Plaintiff has failed to exhaust his administrative remedies on the issues which are the subject of this litigation. Since the failure to exhaust was the Plaintiff's fault, Defendants are entitled to judgment as a matter of law.

## CONCLUSION

WHEREFORE Defendants Yan Yu, James Kapotas, Barbara Davis and Cook County, for all of the foregoing reasons, respectfully request that this Honorable Court grant Defendants summary judgment on all counts of Plaintiff's Third Amended Complaint along with any such other relief as this Court deems just and appropriate.

Respectfully Submitted,

ANITA ALVAREZ
State's Attorney of Cook County

By:     /s/ Kevin Frey
        Kevin Frey
        Assistant State's Attorney
        69 West Washington, Suite 2030
        Chicago, Il 60602
        (312) 603-1440