# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ANTWAIN BAILEY, | ) | |
| | ) | Case No. 08 C 4441 |
| Plaintiff, | ) | |
| | ) | Judge MAROVICH |
| vs. | ) | |
| | ) | Magistrate Judge MASON |
| | ) | |
| COOK COUNTY, ILLINOIS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S MEMORANDUM IN RESPONSE
## TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff, Antwain Bailey, by his undersigned attorney, for his Memorandum in Response to Defendants' Motion for Summary Judgment, states as follows:

### INTRODUCTION

Antwain Bailey's right leg was amputated as a result of an infection that developed while he was in the custody of the Defendants at Cook County Jail—specifically Cermak Health Services and the Residential Treatment Unit. That facility is the subject of a scathing report by the Department of Justice that identified serious, systematic problems in the provision of healthcare at the jail—a report that Cook County's own witness admitted in his deposition is accurate in many respects.

As a result of this systematic breakdown in the provision of medical care at Cook County Jail, Mr. Bailey did not receive the basic level of medical care required by the 14th Amendment to the U.S. Constitution. As a result, Mr. Bailey developed a serious infection, causing him severe pain and necessitating repeated painful surgeries, which

ultimately led to a life threatening condition. Based on the recommendation of one of his physicians, who advised him that his infection could become fatal, Mr. Bailey felt he had no choice but to have his right leg amputated.

Had Mr. Bailey received the minimum level of constitutionally required medical care, he would not have suffered severe pain for six months, and he more likely than not would still have his right leg today. Although Defendants dispute that they were the cause of Mr. Bailey's infection and ultimate amputation, this simply raises an issue of fact, rendering summary judgment inappropriate. There are genuine issues of material fact in this case, both as to Mr. Bailey's claims against the individual Defendants as well as against Cook County under *Monell v. New York City Dep't of Soc. Services*, 436 U.S. 658 (1978). Accordingly, Mr. Bailey respectfully requests that Defendants' motion be denied in its entirety.

## STATEMENT OF FACTS[1]

### I. Mr. Bailey Sustained Multiple Leg Fractures On August 7, 2006 But Was Successfully Treated At Christ Medical Center.

On August 7, 2006, Mr. Bailey suffered multiple fractures to his right leg as a result of a motorcycle accident involving a Chicago Police vehicle. (D's Facts ¶ 12). Mr. Bailey was arrested and taken to Christ Medical Canter, where he received surgeries for his fractures and the associated wound. (*Id.* at ¶¶ 13, 15-17). He was given a soft bandage wrap around his wound at Christ. (*Id.* at ¶ 18). According to Plaintiff's expert, the

---

[1] In order to save space, this section contains a brief summary of the most salient facts from Plaintiff's 56.1 Statement, and the Court is referred to that document for a full statement of the facts. Other sections of this memorandum contain additional facts from Plaintiff's 56.1 Statement. The facts from Defendants' 56.1 Statement are referred to herein as "D's Facts," and the facts from Plaintiff's 56.1 Statement are referred to herein as "P's Facts."

treatment Mr. Bailey received at Christ was appropriate, and he saw no evidence of any complications or serious infection to Mr. Bailey's leg. (P's Facts ¶ 1).

## II. Mr. Bailey's Problems Developed At Cermak.

Mr. Bailey was transferred from Christ Hospital to the Cook County Department of Corrections on August 11, 2006, where he was admitted to the emergency room at Cermak. (D's Facts ¶ 19-20). The admission form indicates that hospital records were received, that Mr. Bailey's leg was wrapped in a surgical dressing, and that he was scheduled to have an orthopedic evaluation. (P's Facts ¶ 3). In the initial nursing assessment of Mr. Bailey, it is documented that he was in extreme pain. (P's Facts ¶ 5).

On August 15, Mr. Bailey was transferred to the Residential Treatment Unit (the "RTU"), a residential unit for detainees who do not have acute medical needs. (D's Facts ¶¶ 25-26). Also on that day, Defendant Dr. Yan Yu ordered an orthopedic consultation for Mr. Bailey and noted Mr. Bailey's status as "urgent." According to Dr. Yu, if he did not mark Mr. Bailey's status as urgent, he would not have been seen for a week. (P's Facts ¶ 10).

On August 16, Mr. Bailey was seen by an unknown orthopedic specialist, but in the consultation request form, it is indicated that Mr. Bailey had no medical records, and no findings, impressions or recommendations for further treatment were provided. (P's Facts ¶ 11). According to Mr. Bailey, the specialist did not treat him, and he told Mr. Bailey he had no file. (P's Facts ¶ 11). According to Mr. Bailey's expert, there is no documentation that any medical records were made available to the specialist, or that Mr. Bailey received any treatment for his condition on August 16. (P's Facts ¶ 12).

In the patient transfer form sent by Christ with Mr. Bailey to Cermak, the form stated that his dressings were to be kept on till August 16, but if he was still at Cermak, he would need his dressing changed there. (P's Facts ¶ 2). However, Mr. Bailey's dressings were not changed on August 16. Instead, Defendant Barbara Davis and another unknown Cermak employee placed a hard cast on Mr. Bailey's right leg. (P's Facts ¶ 15). According to Plaintiff's expert, he saw no indication in the medical records that Mr. Bailey received any wound care or that his dressing was changed between August 11-15, 2006. (P's Facts ¶ 14). According to Mr. Bailey, the original dressings from Christ were on Mr. Bailey's leg and had not been changed when his leg was casted. (P's Facts ¶ 15). According to Plaintiff's expert, the casting of Mr. Bailey's leg contributed to the progression of his infection because the wound could not be examined or treated. (P's Facts ¶ 43). Even Davis and Yu agree that Mr. Bailey's leg should not have been casted. (P's Facts ¶ 16).

### III. Mr. Bailey Did Not Receive Any Care For His Wound For Two Weeks.

According to Plaintiff's expert, from August 15-30, there is no indication that Mr. Bailey received any wound care. (P's Facts ¶ 24). During this time period, when Mr. Bailey was in the RTU, his cast began to smell and changed colors, his pain got worse, and although he made repeated complaints to the guards and requested medical attention, he was not seen by a doctor. (P's Facts ¶¶ 17-20).

On August 30, 2006, Mr. Bailey was examined by Dr. Andrew Defuniak, who was an attending physician at the RTU. In the form he prepared documenting his examination of Mr. Bailey, Dr. Defuniak noted, like the unknown orthopedic specialist who saw Mr.

Bailey two weeks earlier, that Mr. Bailey had no medical records. (P's Facts ¶ 21). He also noted that Mr. Bailey's leg had been casted about two weeks previously but the cast was now wet and had a foul order. He thus scheduled Mr. Bailey to have an orthopedic consultation in order to have his cast removed and his wound evaluated. In fact, the matter was serious enough that Dr. Defuniak wanted Mr. Bailey to see the orthopedic specialist that same night to have the cast removed. (P's Facts ¶21).

Mr. Bailey did not make it to the orthopedic specialist that night nor was his cast removed. In fact, the very next day, August 31, Dr. Defuniak again examined Mr. Bailey and generated a second consultation request form. In this document, Dr. Defuniak noted that the cast had not been removed. Accordingly he ordered yet another orthopedic consultation for Mr. Bailey. (P's Facts ¶ 22).

On August 31, 2006, the smell coming from Mr. Bailey's leg was so bad that a Cook County lieutenant noticed it, and sent Mr. Bailey to the emergency room at Cermak, where his cast was removed by Davis and Dr. Kapotas. (P's Facts ¶ 25). According to Mr. Bailey, the rotting flesh was stuck to the inside of the cast, so it had to be torn from his skin. When his cast was removed, there was a large hole in his leg; his wound was malodorous, necrotic, (meaning dead flesh) and infected; the sutures had come apart; and his wound was not healing properly. (P's Facts ¶¶ 25-27).

According to x-rays taken of Mr. Bailey's leg on August 14 and August 31, the infection in Mr. Bailey's leg developed during this time period. According to Dr. Kapotas, the infection developed after Mr. Bailey's leg was casted. (P's Facts ¶¶ 33-34).

On September 1, Mr. Bailey had surgery at Stroger Hospital. According to Dr. Edelman, the records indicate that Mr. Bailey had a significant bacterial infection. (P's Facts ¶ 35).

## IV. Mr. Bailey Consented To An Amputation Because He Was Advised If He Did Not, His Infection Could Kill Him.

In the middle of January 2007, Dr. Kapotas raised the issue of amputation with Mr. Bailey. According to Dr. Kapotas, "an amputation is necessary in the situation if tibial infection is—only if the patient is about to die from the infection." (P's Facts ¶ 39). Dr. Kapotas believes he told Mr. Bailey that his infection could spread and kill him. Another Cook County physician told Mr. Bailey that if he did not agree to the amputation, his infection could get into his bloodstream and he could die. This physician also told Mr. Bailey that they had to amputate because they couldn't do anything else. Mr. Bailey felt he had no choice but to consent to the amputation. On February 14, 2007, Dr. Kapotas amputated Mr. Bailey's leg. (P's Facts ¶ 40-42).

## V. According to Mr. Bailey's Expert, There Was A Complete Failure Of Care For Mr. Bailey At Cermak And The RTU.

Mr. Bailey's expert believes that there was a complete failure to care for Mr. Bailey's wound during his first stint at Cermak, and this failure of care caused a significant infection to develop at the wound site. Had Mr. Bailey received even minimal wound care, it is his belief that, more likely than not, Mr. Bailey's infection would not have developed to the point where an amputation was deemed necessary. Typically, in his experience with open fracture cases, an amputation is performed generally due to a failure to control an infection associated with the fracture site. (P's Facts ¶ 43).

## **ARGUMENT**

### I. **Summary Judgment Standards**

Defendants are entitled to summary judgment only if there is no genuine issue of

material fact and if they are entitled to judgment as a matter of law. *Harney v. Speedway*

*SuperAmerica, LLC,* 526 F.3d 1099, 1103-04 (7th Cir. 2008). "In evaluating a motion for

summary judgment, a court should draw all reasonable inferences from undisputed

facts in favor of the nonmoving party and should view the disputed evidence in the

light most favorable to the nonmoving party." *Id.* To overcome a motion for summary

judgment, the non-moving party need only offer enough evidence such that a "jury

could reasonably find for the nonmoving party." *Walker v. Sheahan,* 526 F.3d 973, 977

(7th Cir. 2008). As demonstrated below result, Plaintiff has offered more than sufficient

evidence from which a jury could find reasonably find in his favor, and therefore

summary judgment should be denied.

### II. **Defendants Davis And Yu Violated Mr. Bailey's 14th Amendment Right To Adequate Medical Care.**

In order to make out a constitutional claim, Mr. Bailey must establish both that a

state actor violated his constitutional rights and causation. *Roe v. Elyea*, 631 F.3d 843, 864

(7th Cir. 2011). Under the 14th Amendment, pretrial detainees such as Mr. Bailey have

the right to adequate medical care. *See, e.g., Williams v. Rodriguez,* 509 F.3d 392,401 (7th

Cir. 2007). To succeed on his 14th Amendment claim, Mr. Bailey must satisfy a two-part

test. He must prove that: (1) he had an objectively serious medical need; and (2) that the

defendants were aware of a risk of harm to him and disregarded that risk. *Hayes v. Snyder,* 546 F.3d 516, 522 (7th Cir.2008).

**A. Mr. Bailey had a serious medical need.**

It is beyond dispute that Mr. Bailey had a serious medical need. A serious medical need not be "life-threatening." *Gutierrez v. Peters,* 111 F.3d 1364, 1370 (7th Cir. 1997). Rather, it can involve "an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id.* at 1373 (citations omitted). When he first arrived at Cermak, Mr. Bailey had sustained multiple fractures to his right leg, he had received several surgeries for his condition, he was scheduled for follow up care, he was in extreme pain (which he reported to personnel at Cermak), and when Dr. Yu ordered an orthopedic consultation for Mr. Bailey, he marked his status as "urgent." Furthermore, Davis was aware of Mr. Bailey's medical need when she put a cast on his leg, and Dr. Defuniak was aware of Mr. Bailey's problem when he examined him on August 30 and 31. Dr. Kapotas and Davis then were so concerned with Mr. Bailey's condition on August 31 that they immediately had him admitted to the emergency room at Stroger hospital. Accordingly, there can be no dispute that Mr. Bailey had a serious medical need.

**B. Defendants Yu And Davis Were Deliberately Indifferent to Mr. Bailey's Serious Medical Need.**

With regard to the deliberate indifference requirement, Mr. Bailey is required "to present facts from which a jury could find that the relevant officials knew of [his] serious medical condition but intentionally or recklessly disregarded it." *Hayes*, 546 F.3d

at 523. Furthermore, Mr. Bailey need not "prove that his complaints . . . were literally ignored; rather, he must show only that the defendants' responses to it were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Id.* at 524 (citations omitted). Furthermore, "[w]hether a prison official acted with deliberate indifference presents a question of fact." *Sherrod v. Lingle*, 225 F.3d 603, 611 (7th Cir. 2000). In this case, there are ample facts from which a reasonable jury could conclude that Dr. Yu and Davis recklessly disregarded Mr. Bailey's serious health condition sufficient to raise an issue of material fact on the question of deliberate indifference.

### 1. Dr. Yu

Dr. Yu admitted that he was the physician in charge at Cermak infirmary in August 2006 and was responsible for the care and treatment of all patients in the infirmary. It was up to him to determine whether a prisoner would be kept in the Cermak infirmary, moved to the RTU, or placed in the general population. He also admitted that it was his responsibility to see that every patient was receiving proper treatment; if something went wrong, he needed to know about it. (P's Facts ¶ 6). Furthermore, Dr. Yu knew that Mr. Bailey needed to see an orthopedic specialist, and he scheduled an orthopedic consultation for him. In fact, he noted that the consultation was urgent. (P's Facts ¶ 10). Nevertheless, Mr. Bailey did not receive the orthopedic consultation on August 16. Instead, a hard cast was placed on Mr. Bailey's leg—which led to the infection of Mr. Bailey's wound and eventually the amputation of his leg.

As this utter failure to provide care to Mr. Bailey occurred under Dr. Yu's watch, he is liable under a theory of supervisory liability under Section 1983 because those he supervised denied adequate medical care to Mr. Bailey, and he "turn[ed] a blind eye for fear of what he or she might see." *Nanda v. Moss*, 412 F.3d 836, 842 (7th 2005) (citing *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988)). It is clear that Dr. Yu knew there were problems in the provision of medical care at Cermak. Indeed, one of the reasons that he indicated an urgent status on the consultation request form he prepared was that he knew if he did not, Mr. Bailey would not be seen for a week. Despite his knowledge that nothing gets done at Cermak, and his acknowledgement that it was his responsibility to see that every patient was receiving proper treatment, Dr. Yu made no effort to see to it that Mr. Bailey received the appropriate care—indeed the very care he ordered for Mr. Bailey. In fact, instead of keeping him at Cermak, Dr. Yu simply shipped him out to the RTU, where detainees with less serious medical conditions were housed. (D's Facts ¶ 26). It was at the RTU that Mr. Bailey essentially fell off everyone's radar, and his wound got so infected that his cast had to be cut off.

In other words, despite his recognition that Mr. Bailey had a serious medical need, and his knowledge that Cermak had serious problems in dealing with serious medical needs, Dr. Yu simply dropped the ball on Mr. Bailey and left him to the devices of a dysfunctional medical system whose dysfunction he was well aware of. Accordingly, there is an issue of fact as to whether Dr. Yu was deliberately indifferent to Mr. Bailey's condition.

### 2. Barbara Davis

According to Mr. Bailey, Barbara Davis was involved in putting the cast on Mr. Bailey's leg. She did not change the wrap on his leg as the Christ transfer instructions indicated, and she did not heed Mr. Bailey's request not to put the cast over his wound. Furthermore, she did not put a window in the cast, which could have a least allowed a way to monitor Mr. Bailey's infection. (P's Facts ¶ 15). Then she did not bother to check on him for another two weeks; but at that point, Mr. Bailey's wound was in such bad shape that he needed emergency care for it. Interestingly, at her deposition, Davis admitted that Mr. Bailey's leg should never have been casted. (P's Facts ¶ 16). By her own admission, she reveals that she was deliberately indifferent to Mr. Bailey's serious medical need.

### C. Davis And Dr. Yu Caused Mr. Bailey's Harm.

The final element that Plaintiff must establish is causation—that Yu and Davis' deliberate indifference to Mr. Bailey's medical needs caused his injury. There are two bases for causation in this case. The first is that, according to Plaintiff's expert, the Defendants' deliberate indifference to Mr. Bailey's condition caused his wound to become seriously infected, and eventually resulted an amputation. (P's Facts 43).

Even though Defendants' experts may disagree with Plaintiff's expert's opinion, this is not sufficient to award summary judgment. For example, in *Gayton v. McCoy*, 593 F.3d 610 (7th Cir. 2010), where the parties' experts disagreed about the cause of the plaintiff's medical condition, the court concluded that it is "up to the jury to determine which of these factors, if any, proximately caused an injury to [the arrestee]." *Gayton,*

11

593 F.3d at 619. Thus, the court reversed the award of summary judgment to the defendant. This is precisely the case here: the parties' experts disagree as to the causation of the condition that led to Mr. Bailey's amputation; it is up to the trier of fact in this case—the jury—to sort out which experts' opinion they believe in.

A second basis of causation is the fact that Mr. Bailey suffered extreme pain and multiple painful surgeries as a result of Defendants' woefully inadequate medical care and delays in treatment. Even assuming, *arguendo*, that this Court finds no causal connection between the Defendants' failure to provide medical care to Mr. Bailey and his eventual amputation, a delay by defendants which causes "many hours of needless suffering" is itself sufficient to create an issue of fact on a deliberate indifference claim. *Grieveson v. Anderson*, 538 F.3d 763, 779-780 (7th Cir. 2008). *See also Williams v. Liefer*, 491 F.3d 710, 716 (7th Cir. 2007). ("[A] jury could find that the defendants' delay caused [the inmate] six extra hours of pain and dangerously elevated blood pressure for no good reason."); *Gil v. Reed*, 381 F.3d 649, 662 (7th Cir. 2004) (recognizing that "hours of needless suffering" can constitute harm under Section 1983).

Here, there were mistakes and delays throughout Mr. Bailey's first three weeks at Cermak: a delay in obtaining the orthopedic consultation called for when Mr. Bailey was first admitted to Cermak; the failure to change his leg dressing by August 16; the improper placement of the cast on his leg; the two-week period in the RTU when he received no response to his complaints as his wound began to smell like rotten meat; and the delay in removing Mr. Bailey's cast.

Accordingly, viewing the facts in the light most favorable to Mr. Bailey, a reasonable jury could conclude that Dr. Yu and Davis's deliberate indifference to Mr. Bailey's serious medical need caused him to suffer severe pain, and also resulted in the development of a serious infection that eventually could only be controlled by an amputation. Accordingly, Defendants' motion as to these Defendants should be denied.

## III. Defendant Cook County Is Liable To Mr. Bailey Under *Monell.*

### A. Standards For Liability Under *Monell.*

Municipalities are liable under Section 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly said to represent official policy, inflicts the injury." *Monell v. New York City Dep't of Soc. Services*, 436 U.S. 658, 694 (1978). Even though a municipal policy is not authorized by a law or express policy, where such a policy is established by a series of widespread practices that are so permanent and well-settled as to constitute a "custom or usage" with the force of law, the municipality is liable for the resulting injury. *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995).

In order to establish municipal liability under Section 1983 for a widespread practice, the plaintiff must show: "(1) he suffered a deprivation of a federal right; (2) as a result of either an express municipal policy, widespread custom, or deliberate act of a decision-maker with final policy-making authority for the City; which (3) was the proximate cause of his injury." *Ienco v. City of Chicago,* 286 F.3d 994, 997-98 (7th Cir. 2002).

13

A widespread practice claim can be established through a number of methods, and there are no "bright line rules defining a 'widespread custom or practice.'" *Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). One method the plaintiff can rely on is to show "'a series of violations to lay the premise of deliberate indifference.'" *Id.* (*quoting Palmer v. Marion County*, 327 F.3d 588, 592 (7th Cir. 2003)). In other words, "municipal liability can also be demonstrated indirectly 'by showing a series of bad acts and inviting the court to infer from them that the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of subordinate officers.'" *Woodward v. Correctional Medical Serv. Of Ill.*, 368 F.3d 917, 927 (7th Cir. 2004) (*quoting Jackson v. Marion County*, 66 F.3d 151, 152 (7th Cir. 1995)).

**B. There Was A Systematic Failure In The Provision Of Medical Care At Cook County Jail And This Failure Was The Cause Of Mr. Bailey's Injuries.**

Here, the record reveals a "series of bad acts" in the provision of medical care at Cook County Jail from which this Court can infer that the policymakers at Cook County were "bound to have noticed what was going on" but by "failing to do anything . . . encouraged or at least condoned . . . the misconduct of subordinate officers." *Id.* Indeed, the problems were so widespread that it came to the attention of the Department of Justice. In 2007, the Civil Rights Division of the U.S. Department of Justice conducted an investigation into the conditions at Cook County Jail. In a report dated July 11, 2008 (the "DOJ Report"), the DOJ concluded that "certain conditions at CCJ violate the constitutional rights of inmates." The DOJ Report concludes that

"inmates do not receive adequate medical and mental health care . . . [and that] these conditions have resulted in serious harm to CCJ inmates." (P's Facts ¶¶ 44-45).

Among the many medical care problems identified in the DOJ Report are: (1) inadequate health assessments; (2) inadequate acute care; (3) inadequate record keeping; (4) inadequate medication administration; (5) inadequate access to medical care; and (6) inadequate quality assurance. (P's Facts ¶ 46). According to the DOJ Report, one of the specific problems at CCJ involved "patterns of egregious failures of care regarding wound care . . . ." (P's Facts ¶ 54).The medical records that DOJ reviewed covered the period from 2006-2007, the time period when Mr. Bailey was incarcerated at Cook County Jail and had his leg amputated. (P's Facts ¶ 47).

Dr. Avery Hart, the Chief Medical  Officer of Cermak, is familiar with the DOJ Report.  (P's Facts ¶¶ 48-49). Dr. Hart admitted he is familiar with the problems at Cermak identified in the DOJ Report. Dr. Hart admitted that some of the problems at Cermak identified in the report are accurate. (P's Facts ¶ 50). Dr. Hart acknowledged there is "some validity" to the Report's conclusion that there was inadequate recordkeeping at Cermak. He admitted that Cermak has had problems with "medical record retrieval." Dr. Hart acknowledged that this problem was "the most fundamental part," and that led to the situation where "it was sometimes difficult to have the records of the patients in the same place as the patient's physically located." (P's Facts ¶ 51).

Dr. Hart was also aware that with respect to the sick call process—which was the procedure under which detainees in the RTU were required to request medical care— there were individuals who made repeated requests for medical care but did not receive

any. According to Dr. Hart, there were problems in the procedure for inmates to request medical care—some collection boxes for medical care request forms were missing and some were broken—so the inmates' requests for medical attention would not get to the nurses on a timely basis. (P's Facts ¶ 57).

Dr. Hart also acknowledged the accuracy of the DOJ Report in a number of other areas: medication administration, access to medical care, inadequate medical facilities, inadequate quality assurance, and inadequate health assessments. (P's Facts ¶ 52). Dr. Hart also acknowledged that in some cases patients were not having their scheduled appointments, acute conditions were not monitored, and timely treatment for conditions was not given. This delay in treatment is, according to Dr. Hart, "bound to cause problems in their care." (P's Facts ¶ 53).

In other words, not only does Dr. Hart acknowledge the truth of many of the DOJ Report's conclusions about the health care problems at Cermak, he also acknowledges the causation element—that the delay in treatment is "bound" to cause problems in care. This is precisely the causal mechanism established by Plaintiff's expert in this case—the delay in treatment to Mr. Bailey caused him to suffer prolonged and severe pain, and his eventual amputation.

Indeed, the DOJ analyzed Mr. Bailey's case and concluded that the systematic breakdown in care at Cermak led to the loss of Mr. Bailey's leg. The DOJ Report refers to an "Aaron B.," whom counsel for Defendants believes refers to Mr. Bailey. According to the DOJ Report, an orthopedist refused to treat Aaron B. on August 16, 2006 because his medical records were not provided. The DOJ Report concludes that "Aaron B.'s leg

was amputated as a result of a bone infection resulting from CCJ's failure to provide adequate acute care." (P's Facts ¶ 55).

Even assuming, *arguendo*, that this Court should find that the individual defendants are not liable to Mr. Bailey, Cook County is still liable to Mr. Bailey under *Monell*. In *Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293 (7th Cir. 2010), the Seventh Circuit upheld a *Monell* claim against Cook County arising out of a failure to provide medical care to a detainee at Cook County Jail. In so holding, the Seventh Circuit put to rest the mistaken notion, derived from *Los Angeles v. Heller*, 475 U.S. 796 (1986), that *Monell* claims are necessarily derivative of a plaintiff's claims against individual defendants and that a *Monell* claim rises and falls with the success of the claims against the individual defendants. The *Thomas* Court expressly rejected this reading of *Monell*, holding instead that "a municipality can be . . . liable under *Monell*, even when its officers are not, unless such a finding would create an inconsistent verdict." *Thomas*, 604 F.3d at 305. The court rejected the County's proposed "rule that requires individual officer liability before a municipality can ever be held liable for damages under *Monell*." *Id.* Hypothesizing the situation where the plaintiff simply chose not to sue individual officers, or he could not identify the guilty officers, the court concluded that to "determine whether the [municipality's] liability is dependent on its officers, we look to the nature of the constitutional violation, the theory of municipal liability, and the defenses set forth." *Id.*

Applying this rule to the facts of the case, the court concluded that the jury could simultaneously find that the county employees were not deliberately indifferent to the

detainee, but they nevertheless could not respond adequately to the detainee's medical needs because of the "well-documented breakdowns" in the county's policies for providing adequate health care to its detainees. Accordingly, the court held that "a municipality can be . . . liable under *Monell*, even when its officers are not, unless such a finding would create an inconsistent verdict." *Id*. This is precisely the case here. Given the well documented breakdowns in medical care at Cook County Jail, the County is directly liable to Mr. Bailey whether or not Yu and Davis were responsible for his injuries.

In short, given the shocking pattern of poor medical care at Cermak identified in the DOJ Report, which was confirmed in many respects by Dr. Hart, and which occurred in this very case and caused Mr. Bailey's suffering and eventual amputation, there are genuine issues of material fact on the *Monell* claim, and summary judgment on this claim should therefore be denied.

## IV. Defendants Are Not Entitled To Qualified Immunity.

Defendants contend they are entitled to qualified immunity. Their argument, however, is simply that because they did not cause any harm to Plaintiff, they are entitled to qualified immunity. This is simply not the law. In the face of a qualified immunity defense, Mr. Bailey need only satisfy a simple, two-prong test: he must allege (1) the deprivation of an actual constitutional right; and (2) that the right in question was clearly established at the time of the alleged violation. *Wilson v. Layne*, 526 U.S. 603, 609 (1999). Mr. Bailey easily meets both parts of this test.

With respect to the constitutional right, Mr. Bailey alleges a claim under the 14th Amendment for the Defendants' failure to provide adequate medical care. As to the second prong, his right to adequate medical care was "firmly established" in August 2006. Indeed, a prisoner's constitutional right to medical care was "clearly established" more than 30 years ago by the U.S. Supreme Court in *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). Thus, when Antwain Bailey was in the custody of Defendants in August 2006, his right to adequate medical care was firmly established. Accordingly, Defendants are not entitled to qualified immunity.

**V**. **Mr. Bailey's Claims Are Not Barred By The Exhaustion Doctrine.**

Defendants' final argument is that Mr. Bailey failed to exhaust his administrative remedies. This argument fails for several reasons. First, Defendants have waived this argument. Although Defendants filed a *Pavey* motion on April 23, 2009 (Docket No. 106), they withdrew that motion two years ago. (*See* Docket Entry No. 126 dated August 4, 2009). As Defendants withdrew their motion, they should not be heard to raise it again at this late date, particularly since, under *Pavey v. Conley*, 544 F.3d 738, 742 (7th Cir. 2008), there is no point in the exhaustion doctrine once discovery has been completed. In any event, there was no exhaustion requirement at Cermak and the RTU. Dr. Yu, Dr. Defuniak and Davis all agreed grievances were not required and detainees could simply complain directly to the physicians if they had problems. (P's Facts ¶¶ 60-61). Finally, Mr. Bailey did file several formal and informal grievances regarding the problems with his leg, but his grievances were not responded to or apparently lost. (P's Facts ¶¶ 62-66). Indeed, Dr. Hart conceded that this has been a problem at Cermak (P's

Facts ¶ 57), and the DOJ also found that there were problems in what it calls quality assurance. (P's Facts ¶ 46). There is simply no basis for applying the exhaustion doctrine in this case.

## CONCLUSION

Antwain Bailey was the victim of a dysfunctional medical institution that was taken to task by the Department of Justice, and one of the County's own witnesses admitted that there is a great deal of truth in the DOJ Report. Indeed, the failures in this case were precisely those documented in the DOJ report—a failure in acute care, a failure in medical assessments, a failure in record keeping, and a failure in quality control. These failures led directly to the loss of Mr. Bailey's leg and to a lifetime of pain and suffering.

Accordingly, for the foregoing reasons, Mr. Bailey respectfully requests that Defendants' motion for summary judgment be denied.

Respectfully Submitted,

ANTWAIN BAILEY


By:     /s/ Josh M. Friedman
        One of his attorneys



JOSH M. FRIEDMAN
Law Offices of Josh Friedman
53 W. Jackson, Suite 840
Chicago, IL 60604
(312) 886-0277

<u>**CERTIFICATE OF SERVICE**</u>

I, Josh Friedman, attorney for Plaintiff, hereby certify that I served a copy of the foregoing Memorandum in Response to Defendants' Motion for Summary Judgment by this Court's ECF system on all counsel of record on this 4th day of August, 2011:

<u>/s/Josh Friedman</u>