## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ANTWAIN BAILEY, | ) | |
| | ) | Case No. 08 C 4441 |
| Plaintiff, | ) | |
| | ) | Judge MAROVICH |
| vs. | ) | |
| | ) | Magistrate Judge MASON |
| | ) | |
| COOK COUNTY, ILLINOIS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S LOCAL RULE 56.1(b)(3) RESPONSE TO DEFENDANTS'
STATEMENT OF UNCONTESTED FACTS AND PLAINTIFF'S STATEMENT OF
ADDITIONAL FACTS THAT REQUIRE DENIAL OF SUMMARY JUDGMENT**

Plaintiff, Antwain Bailey, by his undersigned attorney, for his Local Rule

56.1(b)(3) Response to Defendants' Statement of Uncontested Facts and Plaintiff

Statement of Additional Facts that Require Denial of Summary Judgment, states as

follows:

1.      Antwain Bailey ("Plaintiff") filed his claims against Cook County, Yan Yu

("Dr. Yu"), James Kapotas ("Dr. Kapotas") and Barbara Davis ("PA Davis") pursuant to

42 U.S.C. § 1983.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§

1331, 1343 and 1367.  Venue is proper in this Court because all or a substantial part of

the events or omissions giving rise to Plaintiff's claims occurred within the Northern

District of Illinois.

**Answer:**      Admitted.

2.      Starting August 11, 2006 and at all relevant times to Plaintiff's Third Amended Complaint, Plaintiff was a pre-trial detainee at the Cook County Department of Corrections ("CCDOC").

**Answer:**      Admitted.

3.      Defendant Cook County is a municipal corporation and operates Cermak Health Services which provides medical treatment to detainees, such as Plaintiff, at the CCDOC.

**Answer:**      Admitted.

4.      Defendant Yan Yu, D.O., is employed by Cook County through Cermak Health Services as an attending physician.  In August of 2006, Dr. Yu was the primary care physician in the infirmary, which meant he was responsible for overseeing the medical care of the detainees housed in the infirmary.

**Answer:**      Admitted.

5.      Defendant Barbara Davis, P.A., is a physician's assistant employed by Cook County through Cermak Health Services.  P.A. Davis' responsibilities include diagnosing patients, prescribing medications and treating illnesses or medical conditions.  P.A. Davis also works in the orthopedic clinic once a week, on Thursdays, with Dr. Kapotas.  In August of 2006, P.A. Davis was assigned to Division 6 and between August 11, 2006 and February 14, 2007, she only saw Plaintiff once, on August 31, 2006.

**Answer:**    Denied. Mr. Bailey testified that Davis saw him on several occasions. (Bailey Dep. 140-41).[1]

6.    Defendant James Kapotas, M.D., is a physician employed by Cook County at John Stroger Hospital who also sees detainees at the Cook County Jail once a week, on Thursdays, during the orthopedic clinic with P.A. Davis.

**Answer:**    Admitted.

7.    Plaintiff brings this action pursuant to 42 U.S.C. § 1983 and alleges that the Defendants were deliberately indifferent to his medical condition by refusing to provide medical treatment to him despite his repeated requests for treatment. Defendants have denied these allegations.

**Answer:**    Admitted.

8.    Plaintiff alleges that had he received medical attention while he was in Dr. Yu's care, his osteomyelitis would have been controlled and that ultimately his right leg would not have been amputated. Plaintiff also claims that Dr. Yu had supervisory authority over Cermak Health Services and that Dr. Yu failed to follow up on an orthopedic consultation for Plaintiff. Defendants have denied these allegations.

**Answer:**    Admitted.

9.    Plaintiff alleges that Dr. Kapotas and P.A. Davis refused to provide an orthopedic consultation to Plaintiff on August 16, 2006 because Plaintiff's medical records had not been provided to them. Plaintiff contends that if he had received the orthopedic consultation from Dr. Kapotas and P.A. Davis on August 16th or shortly

---

[1] The cited portions of Mr. Bailey's deposition are attached hereto as Exhibit A.

thereafter, his infection would have been controlled and his right leg would not have been amputated. Defendants deny these allegations.

**Answer:**    Admitted.

10.    Plaintiff's *Monell* claim asserts that the customs, policies and practices of Defendant Cook County proximately caused violations of Plaintiff's constitutional rights in that he was not provided medical care by the medical staff of Cermak Health Services. Plaintiff specifically alleges that the failures in health care included (1) fostering an atmosphere where correctional and medical personnel were encouraged to disregard serious medical needs of detainees; (2) failing to adequately staff the facilities with medical personnel; (3) failing to have adequate medical intake screening procedures in place; (4) failing to adequately staff the facilities with appropriate medical specialists able to handle the medical needs of detainees with serious medical needs; (5) failing to maintain adequate medical recordkeeping practices; (6) failing to have an adequate health assessment system in place; (7) failing to have an adequate medication administration system in place; and (8) failing to have an adequate complaint and grievance system in place. Defendants have denied these allegations.

**Answer:**    Admitted.

11.    The allegations in Plaintiff's Third Amended Complaint arise from the medical treatment provided to Plaintiff from August 15, 2006 to August 30, 2006 while Plaintiff was housed in the Residential Treatment Unit ("RTU") of CCDOC.

**Answer:**    Denied. The allegations in Plaintiff's Third Amended Complaint arise from medical treatment provided to Plaintiff when he first came to Cermak on August 11, 2006 up to the time his leg was amputated on February 14, 2007.

12.    On August 7, 2006, Plaintiff suffered a grade 2 open tibia and fibula fracture to his right leg when the motorcycle he was driving struck a Chicago Police Department squad car causing Plaintiff to be thrown off the motorcycle and onto the cement.

**Answer:**    Admitted.

13.    Plaintiff was placed under arrest by Chicago Police Officers for unlawful use of a weapon and possession of a stolen motor vehicle and transported to Christ Hospital for treatment.

**Answer:**    Admitted

14.    An open fracture occurs where the opening of the skin and soft tissue communicate with the broken bone and the bone is exposed to the air, which increases the potential for infection.

**Answer:**    Admitted.

15.    Plaintiff was hospitalized at Christ Hospital from August 7, 2006 to August 11, 2006, where he received medical treatment for his injuries including multiple surgeries and medication.

**Answer:**    Admitted.

16.    On August 7, 2006, at Christ Hospital, Plaintiff underwent a surgical procedure called an intramedullary nailing or rodding of his tibia where a metal rod

was inserted into his leg from the knee to the ankle joint. Plaintiff's wound was also irrigated.

**Answer:**     Admitted.

17.     On August 9, 2006, at Christ Hospital, Plaintiff underwent an irrigation and debridement surgery where his wound was irrigated and the necrotic (dead) tissue was removed.     At the time of this surgery there was evidence that an infection was present at the wound site.

**Answer:**     Denied. According to Dr. Kapotas, the report of x-rays taken of Mr. Bailey's leg on August 14 indicate there were no signs of infection at that time. (Kapotas Dep. 116).[2]

18.     While at Christ Hospital, Plaintiff's leg was placed in a soft wrap and a splint.

**Answer:**     Admitted.

19.     Plaintiff was discharged from Christ Hospital to the CCDOC on August 11, 2006, with instructions for Plaintiff to take the prophylactic antibiotic Keflex, take a narcotic for pain, keep his leg dry and elevated and keep the soft wrap dressing on until August 16, 2006 or until an orthopedic evaluation.

**Answer:**     Denied. The instructions state that the dressing needed to be changed by August 16.

---

[2] The cited portions of Dr. Kapotas's deposition are attached hereto as Exhibit B.

20. When Plaintiff arrived at CCDOC on August 11, 2006, he did not go through intake screening; instead he went through the Cermak emergency room which was the standard protocol for anyone arriving from an outside hospital. Plaintiff was examined, admitted to Wing 3 West of the infirmary and a prescription was written for 500 mg of Keflex, Tylenol Number 3 for pain, for the dressing on Plaintiff's leg to remain intact until August 16, 2006 and for Plaintiff to be seen in sick call on August 14, 2006.

**Answer:** Admitted.

21. When medical personnel provide treatment to a detainee it is documented in a progress note. The distribution of medication is documented in a Medication Distribution Record ("MAR"). When the medication is dispensed, the nurse puts his or her initials over the date and time that the medication was dispersed.

**Answer:** Admitted.

22. From August 11, 2006 to August 15, 2006, Plaintiff was housed in the infirmary on Wing 3 West, which is located in the Cermak building. Detainees who need more acute care such as individuals just released from the hospital, who needs intravenous antibiotics, dialysis, or other special needs are housed in the infirmary.

**Answer:** Admitted.

23. While Plaintiff was housed on 3 West, he received his medication and was examined by the medical staff. At this time, Plaintiff did not have his leg casted. Instead, he was still wearing the soft wrap around his leg. Plaintiff did not experience a loss of feeling in his leg or drainage from the wound site while in the infirmary.

**Answer:** Plaintiff admits the allegations in the first and third sentences of this Paragraph. Plaintiff denies the allegations in the second sentence as his leg was casted while he was still at Cermak. (*See* Declaration of Antwain Bailey ¶ 3).[3]

24.    On August 14, 2006, Dr. Yu examined Plaintiff and ordered x-rays. Dr. Yu also wrote a prescription to discontinue Plaintiff's wheelchair and get Plaintiff on crutches so that he would get up and move around to prevent a blood clot from forming in his leg.

**Answer:** Admitted.

25.    On August 15, 2006, Dr. Yu discharged Plaintiff to the Residential Treatment Unit (RTU) because Plaintiff only needed medications and crutches. This discharge included a prescription for Keflex, Motrin, crutches and a referral to the orthopedic clinic. Once Plaintiff was discharged to the RTU, Dr. Yu was no longer Plaintiff's primary care physician, so Dr. Yu did not need to be consulted or informed about Plaintiff's care.

**Answer:** Admitted.

26.    Plaintiff was discharged to the RTU because detainees who only need an intermediate level of medical care were housed at the RTU. A detainee housed in the RTU could be housed in general population; however, it was a more efficient deployment of resources to house these patients in one division that had ADA accommodations and nursing staff around the clock.

**Answer:** Admitted.

---

[3] A copy of Mr. Bailey's Declaration is attached hereto as Exhibit C.

27.     Detainees housed in the RTU were in a dormitory-style setting with each tier housing approximately 30 detainees in a large room with one correctional officer. The detainees had the freedom to move around not only the tier, but the RTU itself. The detainees were not seen by doctors or physician's assistants on a daily basis, instead they were seen by medical personnel when scheduled for an appointment, when they filled out health request forms to see medical personnel, or if they had been referred by correctional officers, social worker or nurses.

**Answer:**     Admitted.

28.     While Plaintiff was housed in the RTU he received his medication, was sent to the orthopedic clinic and had his leg casted.

**Answer:**     Denied. Plaintiff stated that on several occasions at the RTU that he did not receive his pain medication.  (*See* Plaintiff's Statement of Additional Facts below at ¶ 20).

29.     Dr. Yu, Dr. Kapotas and P.A. Davis did not work in the RTU during the relevant time period of August 15, 2006 to August 31, 2006, and were not responsible for Plaintiff's medical treatment while he was at the RTU.  Dr. DeFuniak was the attending physician in the RTU while Plaintiff was housed there from August 15, 2006 to August 31, 2006.

**Answer:**     As to the first sentence, denied. As alleged by Defendants in Paragraph 30, Davis and Kapotas were assigned to the orthopedic clinic during this period and as such would have been responsible for treating Mr. Bailey's orthopedic condition. Admitted as to the second sentence.

9

30. The orthopedic clinic, located in the basement of the Cermak building, took place on Wednesdays and Thursdays. The clinic was staffed with a physician, physician's assistant and orthopedic technicians. Dr. Alan Malk and PA Harry Preskopf worked in the orthopedic clinic on Wednesdays and Dr. Kapotas and PA Davis worked on Thursdays.

**Answer:** Admitted.

31. Based upon the referral of Dr. Yu, Plaintiff was seen in the orthopedic clinic on Wednesday, August 16, 2006. Sometime on or after August 16, 2006, a cast, with a window was put on Plaintiff's right leg by orthopedic technicians.

**Answer:** Admitted as to the first sentence. Plaintiff denies the second sentence of Paragraph 31 as Mr. Bailey's cast did not have a window. (Bailey Declaration ¶ 6).

32. On August 30, 2006, Plaintiff was seen in the RTU by Dr. DeFuniak and Plaintiff related that he had gotten his cast wet and there was a foul odor coming from his cast. Dr. DeFuniak did not consider this to be an emergency because a wet cast with a foul odor does not necessarily indicate a problem. Dr. DeFuniak referred Plaintiff to the orthopedic clinic that same day to have the cast removed and the wound looked at.

**Answer:** Mr. Bailey denies the first sentence of Paragraph 2 as he denies that he got his cast wet. (Bailey Declaration ¶ 7). Mr. Bailey admits the remaining allegations in this Paragraph.

33. Plaintiff was seen by Dr. DeFuniak the next day on August 31, 2006, a Thursday, and Dr. DeFuniak again referred Plaintiff to the orthopedic clinic. Plaintiff

was seen later that day by PA Davis and Dr. Kapotas; this was the first time that either PA Davis or Dr. Kapotas had seen Plaintiff.

**Answer:** Mr. Bailey denies that this was the first time he saw Davis. (*See* Plaintiff's Response to Paragraph 5 above). Answering further, Mr. Bailey admits the remaining allegations in this Paragraph.

34. When PA Davis examined Plaintiff, the bottom of his cast was wet, but the fiberglass was still intact. PA Davis removed Plaintiff's cast, noted that there was necrotic tissue and a foul odor coming from Plaintiff's right leg and believed Plaintiff needed to be transferred to Stroger Hospital for further medical treatment.

**Answer:** Admitted.

35. Dr. Kapotas also examined Plaintiff's leg after his cast was removed and observed an apparent infection at the wound site that would require an irrigation and debridement surgery. Dr. Kapotas ordered x-rays to be done and sent Plaintiff to Stroger Hospital.

**Answer:** Admitted.

36. Because surgeries were not performed at CCDOC, Plaintiff was transferred to the emergency room at Stroger Hospital. Dr. Kapotas sent Plaintiff to the emergency room so that Plaintiff could be admitted to Stroger more quickly. Dr. Kapotas also notified the on call orthopedic specialist to ensure that Plaintiff would be admitted to Stroger.

**Answer:** Admitted.

37. Plaintiff was admitted to Stroger Hospital on August 31, 2006. Plaintiff

underwent an irrigation and debridement surgery on September 1, 2006, where his wound was cleaned out, debrided, and antibiotic beads were placed in his leg.

**Answer:**     Admitted.

38.     Plaintiff was diagnosed with osteomyelitis which is an infection in the bone caused by the bone's exposure to bacteria. The problem with osteomyelitis is that once someone has it, they have it for life. Plaintiff would always be susceptible to it because the bacteria would always be there.

**Answer:**     Admitted.

39.     The medical evidence indicates that the open fracture Plaintiff suffered was the most likely cause of Plaintiff's osteomyelitis. It would be unusual for there to be outward signs of infection right after a bone is broken, instead, the nidus or bacteria for the osteomyelitis Plaintiff suffered from most likely seeded in the wound when the bone was broken. It takes some time, at least 24-48 hours before an infection would start to blossom and a person could actually see signs of it.

**Answer:**     Admitted.

40.     Plaintiff had another irrigation and debridement surgery on September 12, 2006, and the antibiotic beads that had been placed in Plaintiff's leg on September 1st were removed and replaced with new antibiotic beads.

**Answer:**     Admitted.

41.     On September 21, 2006, Plaintiff was placed on a device called a wound vac where a sponge was placed on Plaintiff's wound and suction was added to create negative pressure to stimulate the tissue and blood flow. The wound vac was used to

try and close the wound because the infection appeared to be under control. Plaintiff was taken off the wound vac on October 3, 2006 and placed on a regiment of wet to dry dressing changes.

**Answer:**     Admitted.

42.     While at Stroger Hospital from August 31, 2006 to October 9, 2006, Plaintiff's treatment included antibiotics, dressing changes, multiple surgeries, being placed on a wound vac, pain medications, and referrals to infectious disease specialists. All of these measures were taken in an attempt to save the metal hardware that had originally been placed in Plaintiff's leg. This hardware was used to maintain alignment and provide stability to the bone.

**Answer:**     Admitted.

43.     Plaintiff was discharged from Stroger Hospital back to CCDOC on October 9, 2006, because his wound was getting better, he was no longer in need of inpatient care and Cermak medical personnel could provide Plaintiff with dressing changes, antibiotics and pain medications.

**Answer:**     Admitted.

44.     After Plaintiff returned to CCDOC on October 9, 2006, he was seen in the emergency room, then housed in the infirmary on Wing 3 North where he was placed on intravenous antibiotics to combat his osteomyelitis.

**Answer:**     Admitted.

45.     During Plaintiff's stay on 3 North from October 9, 2006 to October 31, 2006, Plaintiff received his medications and dressing changes.

**Answer:**        Admitted.

46.        Dr. Yu saw Plaintiff on October 10 and October 11, 2006.  Dr. Yu ordered x-rays to be taken, wrote prescriptions for medications and made a referral to the orthopedic clinic where Plaintiff was seen by the clinic personnel.

**Answer:**        Admitted.

47.        Plaintiff was seen again by Dr. Yu on October 17, 2006, and Dr. Yu observed no change in Plaintiff's condition.

**Answer:**        Admitted.

48.        Dr. Yu examined Plaintiff on October 22 and 23, 2006, and found that Plaintiff's wound appeared to be getting worse so he consulted with Dr. Chad Zawitz, an infectious disease specialist for Cermak Health Services, and made another referral for Plaintiff to be seen in the orthopedic clinic.  Dr. Yu also renewed Plaintiff's prescriptions for dressing changes, antibiotics and pain medications.  On October 24, 2006, Dr. Yu changed Plaintiff's antibiotic prescription based upon the recommendations of Dr. Zawitz and ordered x-rays.

**Answer:**        Admitted.

49.        Plaintiff was seen by Dr. Kapotas in the orthopedic clinic on October 26, 2006, and Dr. Kapotas ordered that Plaintiff return to Stroger Hospital the following week because his wound was not healing.

**Answer:**        Admitted.

50.     When Plaintiff returned to Stroger on October 30, 2006, he was given a more aggressive form of treatment which included dressing changes, medications, surgeries, infectious disease referrals, and the wound vac.

**Answer:**     Admitted.

51.     On November 9, 2006 the intramedullary rod and screws in Plaintiff's leg were replaced by an antibiotic cement rod which delivered antibiotics to the bone and provided stability to Plaintiff's leg.

**Answer:**     Admitted.

52.     Plaintiff was put on the wound vac again on November 17, 2006.

**Answer:**     Admitted.

53.     After x-rays were taken on November 21, 2006, it was determined that Plaintiff would need an external fixator for his leg to provide more stability to the bone and control the fracture better.  An external fixator is pins and metal rods or bars that are placed on the outside of the skin.  The surgery to put the external fixator in place was performed on November 22, 2006.

**Answer:**     Admitted.

54.     Plaintiff was discharged back to CCDOC on December 18, 2006, because his wound had gotten better and appeared free from infection.

**Answer:**     Admitted.

55.     Upon his return to CCDOC on December 18, 2006, Plaintiff was housed in the infirmary on Wing 3 North of the Cermak building.  While on 3 North, Plaintiff was examined by medical personnel, received medications and dressing changes.

**Answer:**      Admitted.

56.      Dr. Yu examined Plaintiff on December 19, 2006 and wrote prescriptions for antibiotics, pain medications and anti-diarrhea medications.  Dr. Yu also wrote prescriptions for pain medications and anti-diarrhea medications for Plaintiff on December 22, 2006.

**Answer:**      Admitted.

57.      When Dr. Yu examined Plaintiff on December 26, 2006, observed moderate discharge coming from Plaintiff's external fixator and he wrote a prescription for anti-diarrhea medication.

**Answer:**      Admitted.

58.      Plaintiff was transferred back to Stroger Hospital on December 28, 2006.

**Answer:**      Admitted.

59.      The medical treatment Plaintiff received while hospitalized at Stroger Hospital from December 28, 2006 to February 14, 2007, included physical examinations, medications, surgical procedures and the wound vac.

**Answer:**      Admitted.

60.      Plaintiff underwent an irrigation and debridement surgery on January 3, 2007, where his antibiotic rod was replaced with antibiotic beads.  This was followed up with another irrigation and debridement surgery on January 12, 2007, where the antibiotic beads were removed from his leg.

**Answer:**      Admitted.

61.    On February 5, 2007, Dr. Kapotas discussed what treatment options and alternatives were available to Plaintiff.  Plaintiff had become frustrated with the hospital stays, the multiple surgeries and the infection.  Dr. Kapotas informed Plaintiff that his options included further wound care and debridement surgeries, a bone transport procedure or amputation.  Plaintiff wanted the treatment option that would guarantee his osteomyelitis would not come back.  Dr. Kapotas explained to Plaintiff that the only option that would completely eliminate his osteomyelitis was amputation.

**Answer:**    Plaintiff admits the first two sentences of Paragraph 61. Plaintiff denies the remaining allegations in this paragraph as he was advised by his physicians that if he did not have his leg amputated, his infection could be fatal. Thus, Mr. Bailey denies he was given any options. (*See* Plaintiff's Statement of Additional Facts below at ¶¶ 40-41).

62.    Bone transport is a procedure where a segment of bone is removed at the site of the fracture and a device is placed around the leg with pins and wires going through it.  The bone is also cut just underneath the patella tendon and moved down a millimeter a day so that it will dock into empty space where the segment of bone was removed.  The body then backfills the remaining empty space with bone where the bone was cut.

**Answer:**    Admitted.

63.    On February 6, 2007, Plaintiff first stated to Dr. Kapotas that he was considering amputation.  Plaintiff was given his treatment options multiple times from February 6, 2007 to February 14, 2007 and each time Plaintiff seemed adamant that he

17

wanted to have the amputation. Plaintiff did discuss the possibility of amputation with his mother and sister.

**Answer:** Denied. Plaintiff never wanted an amputation or raised the issue of amputation. He eventually consented to the amputation because he was advised by his physicians that if he did not agree to the amputation, there was a possibility he could die from the infection. (*See* Plaintiff's Additional Facts below at ¶¶ 40-41).

64. Plaintiff chose amputation because his wound was not healing, he had undergone multiple surgeries, and he had multiple hospitalizations. Dr. Kapotas reminded Plaintiff about the finality of amputation because Plaintiff had other treatment options available and did not have to undergo an amputation because his osteomyelitis was not a life threatening condition. Plaintiff said he was going to make the police or County pay for what happened to him.

**Answer:** Denied. Plaintiff never wanted an amputation or raised the issue of amputation. He eventually consented to the amputation because he was advised by his physicians that if he did not agree to the amputation, there was a possibility he could die from the infection. (*See* Plaintiff's Additional Facts below at ¶¶ 40-41).

65. On February 14, 2007, Plaintiff signed a consent for the amputation surgery which outlined the procedure, the risks of the procedure and treatment alternatives. After the consent was signed by Plaintiff, Dr. Kapotas amputated Plaintiff's right leg below the knee.

**Answer:** Admitted.

66. Plaintiff filed three grievances while he was pre-trial detainee at the CCDOC.

**Answer:** Denied. Plaintiff submitted formal and informal grievances in addition to those identified above. (*See* Plaintiff's Statement of Additional Facts below at ¶¶ 62-66).

67. The three grievances were all filed after Plaintiff's amputation and are unrelated to the allegations in Plaintiff's Third Amended Complaint.

**Answer:** Plaintiff admits that the three grievances referred to above were filed after his amputation. Answering further, Plaintiff denies that the grievance dated April 15, 2007 cited by Defendants is unrelated to the allegations in Plaintiff's Third Amended Complaint as it refers to Mr. Bailey's complaints about his leg before it was amputated.

68. The grievance dated April 15, 2007, Control # 2007-0791, was in regards to Plaintiff's placement in April of 2007 in the RTU as opposed to Wing 3 North. Plaintiff did not appeal the response to this grievance.

**Answer:** Admitted.

69. The grievance dated April 18, 2007, Control # 2007-0809, was in regards to the medical care Plaintiff failed to receive while housed in the RTU in April of 2007. Plaintiff did not appeal the response to this grievance.

**Answer:** Admitted.

70.     The grievance dated May 18, 2007, Control # 2007-1028, was in regards to Plaintiff's failure to see a doctor in April of 2007 and receive a compression sock for his residual limb.  Plaintiff did not appeal the response to this grievance.

**Answer:**        Admitted.

## PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS THAT REQUIRE DENIAL OF SUMMARY JUDGMENT

1.     According to Plaintiff's expert physician, Dr. Mark Edelman, the treatment Mr. Bailey received at Christ Medical Center was appropriate, and in his review of the Christ medical records he saw no evidence of any complications or serious infection to Mr. Bailey's leg. (*See* Expert Report of Dr. Mark Edelman p. 1).[4]

2.     In the patient transfer form sent by Christ with Mr. Bailey to Cermak, Mr. Bailey was scheduled to have a follow up on August 16 for a dressing change at Christ. The form also states that his dressings were to be kept on until August 16, but if he was still at Cermak, he would need his dressing changed there. (*See* Exhibit J to Defendants' Statement of Facts at Bates Nos. 95-96)

3.     In the records documenting Mr. Bailey's admission to the Cermak emergency room it is indicated that Mr. Bailey's hospital records were received at Cermak. The document also indicates that Mr. Bailey's leg was wrapped in a surgical dressing, not a hard cast, and that he was scheduled to be seen at the orthopedic specialty clinic. According to Dr. Yu, Mr. Bailey needed to see an orthopedic specialist

---

[4] The Edelman Report is attached hereto as Exhibit D.

at Cermak for his leg condition because someone needed to monitor his progress. (Yu

Dep. 79-80; Yu Dep. Exh. 2).[5]

4.      According to Dr. Yu, when a patient is admitted to Cermak from another

facility and has medical records, those records will be reviewed at Cermak because

those records are important information. (Yu Dep. 51). Dr. Yu also stated that Mr.

Bailey's Cermak admission records indicate his medical records from Christ were

reviewed by someone at Cermak. (Yu Dep. 71-72).

5.      According to the Nursing Admission Assessment Mr. Bailey received on

August 11 (Yu Dep. Exhibit 3), Mr. Bailey reported having constant pain at a level of

10—which, according to the document,  is the "worst imaginable." According to Dr. Yu,

Mr. Bailey had the maximum amount of pain available under the pain scale. (Yu Dep.

91).

6.      According to Dr. Yu, in August 2006, he was the physician in charge at the

Cermak infirmary. It was up to him to determine whether a prisoner would be kept in

the infirmary, moved to the RTU or placed in the general prison population. (Yu Dep.

27). According to Dr. Yu, he was the doctor responsible for the care and treatment of all

patients in the infirmary in August 2006. (Yu Dep. 27, 30). If something went wrong, he

needed to know about it. (Yu Dep. 30). It was his responsibility to see that every patient

was receiving the proper treatment. (Yu Dep.  32).

---

[5] The cited portions of Dr. Yu's deposition and associated exhibits are attached hereto as
Exhibit E.

7.      Mr. Bailey was in extreme pain at Cermak. (Bailey Dep. 47). On several occasions, nurses failed to bring him his pain medication. (Bailey Dep. 45).

8.      On August 15, 2006, Dr. Yan released Mr. Bailey to the RTU.  At that time, Mr. Bailey needed his dressing changed. (Yu. Dep. 125-26).

9.      Dr. Yu also indicated that Mr. Bailey needed to be evaluated by an orthopedic specialist the next day and that he would in fact see the orthopedic specialist the next day. (Yu Dep. 126-27).

10.     Dr. Yu prepared a consultation request form on August 15, 2006 directing that Mr. Bailey see an orthopedic specialist. (Yu Dep. 129-30; Yu Dep. Exh. 6). In this form, Dr. Yu noted that Mr. Bailey's status was "urgent"; he wanted him to be seen by the orthopedic specialist as soon as possible to make sure that Mr. Bailey would heal properly. (Yu Dep. 131-32). Dr. Yu also that at Cermak, if the physician does not mark the patient's status as urgent, the patient won't be seen for a week. (Yu Dep. 132).

11.     Mr. Bailey did not receive treatment from an orthopedic specialist on August 16 as Dr. Yan had ordered, and the specialist said he had no file for Mr. Bailey. (Bailey Declaration ¶ 5). In the consultation form documenting what occurred on August 16, there was an indication that there was "no chart" for Mr. Bailey and his medical records were not available. (Yu Dep. 136-37; Yu Dep. Exh. 6). The form does not contain any findings or impressions, and also does not contain any recommendations for further treatment. The form also states that Mr. Bailey was to be seen in six weeks. (Yu Dep. 135-36; Yu Dep. Exh. 6).

12.     According to Dr. Edelman, there is no indication in the August 16 consultation form that a chart was made available that day or that Mr. Bailey received any treatment that day. (Edelman Report p. 2).

13.     According to Dr. Yu, the normal process is to have the records available when the patient is seen by a specialist. (Yu Dep. 137).

14.     According to Dr. Edelman, there is no indication in the medical records that Mr. Bailey received any care for his wound from August 11-15, 2006. (Edelman Report p. 2).

15.     On or about August 16, 2006, Defendant Davis an unidentified individual from Cermak placed a hard cast over Mr. Bailey's right leg.  (Bailey Dep. 140-41; Bailey Declaration ¶ 6). Prior to the placement of the cast, no one at Cermak had changed the dressing over Mr. Bailey's leg or examined the wound. (Bailey Declaration ¶ 4). Defendants have produced no documentation as to when Mr. Bailey's leg was casted or who casted it.

16.     Dr. Yu believes it is not proper to put a cast over an infected wound. (Yu Dep. 299-300). Davis also stated that putting a cast on a patient where the order indicated that the dressing was to be kept intact until seen by an orthopedic specialist was not proper. (Davis Dep. 59). [6]

17.     After Mr. Bailey was casted, no one checked on him for a week. (Bailey Dep. 29) Mr. Bailey's leg then started smelling, he lost feeling in his foot, and the cast

---

[6] The cited portions of Ms. Davis's deposition and associated exhibits are attached hereto as Exhibit F.

began leaking a yellowish substance. (Bailey Dep. 29) Mr. Bailey began complaining to medical personnel in the RTU but he received no response to his complaints for approximately two weeks. (Bailey Dep. 29-30)

18.     After about a week in the RTU, Mr. Bailey started to lose feeling in his toes and a few days later he started noticing a smell coming from his wounded leg. It smelled "horrible," like spoiled meat. Mr. Bailey filled out a request to see a doctor but he did not see a doctor. (Bailey Dep. 59-61).

19.     According to Mr. Bailey, his condition grew increasingly worse every day. He complained to a nurse and an officer but nothing was done at that time. (Bailey Dep. 62-63).

20.     In the RTU, Mr. Bailey requested pain medications from the guards but many times he did not receive them. (Bailey Dep. 55-56). He also put in several detainee health service request forms asking for pain medication and to have a doctor see his cast but he did not receive any response.  (Bailey Dep. 182-84). He also stated that during the two weeks he was in the RTU, he complained to the guards on every shift about the smell coming from his cast and requested a doctor but he received no response to these complaints. (Bailey Dep. 269).

21.     On August 30, 2006, Dr. Andrew Defuniak, an attending physician at the RTU, examined Mr. Bailey. (Defuniak Dep. 31).[7] Like the individual who prepared the August 16th consultation report, in the consultation request form he prepared

---

[7] The Cited portions of Dr. Defuniak's deposition and associated exhibits are attached hereto as Exhibit G.

documenting his examination of Mr. Bailey, Dr. Defuniak ordered an orthopedic consultation for Mr. Bailey and noted that he did not have any medical records for Mr. Bailey. He also noted that Mr. Bailey had been casted about two weeks earlier, but the cast was now wet and had a foul odor. (Defuniak Dep. 32-33; Defuniak Dep. Exh. 3). Dr. Defuniak wanted Mr. Bailey to see an orthopedic specialist that night to have his cast removed. (Defuniak Dep. 35-36).

22.     Despite Dr. Defuniak's concerns, Mr. Bailey's cast was not removed on August 30, 2006. On August 31, 2006, Dr. Defuniak again examined Mr. Bailey and prepared another consultation request form.  In this document, he noted that Mr. Bailey's cast had not yet been removed. Accordingly, he again directed that Mr. Bailey have an orthopedic consultation. (Defuniak Dep. 37-38; Defuniak Dep. Exh. 4).

23.     According to Mr. Bailey, Dr. Defuniak did nothing to address Mr. Bailey's complaints, and he simply told Mr. Bailey that he had gotten his cast wet through sweating. (Bailey Dep. 30). Mr. Bailey did not get his cast wet, nor did his sweat cause the problem with his cast. (Bailey Declaration ¶ 7).

24.     According to Dr. Edelman, the medical records contain no indication whatsoever that Mr. Bailey received any wound care from August 15-30, 2006. (Edelman Report p. 2).

25.     On August 31, 2006, the smell coming from Mr. Bailey's cast was so bad that a Cook County lieutenant noticed it, said that something wasn't right, and sent Mr. Bailey back to Cermak, where his cast was cut off.  (Bailey Dep. 63). After the cast was removed, there was big hole in Mr. Bailey's leg and it smelled so bad that everyone left

the room.  (Bailey Dep. 30). According to Mr. Bailey, the infection was all over the inside

of the cast—blood and discharge stuck to his leg and cast so they had to rip the cast off

his flesh. (Bailey Dep. 64).

26.     According to Davis, after she removed Mr. Bailey's cast, there was an odor

coming from his leg and some dead tissue.  In the consultation document she prepared,

she noted that Mr. Bailey's wound was "malodorous" and "necrotic" (meaning dead

flesh); there was "increased swelling," and the sutures were not approximated. (Davis

Dep. 120-123 and Exh. 9).

27.     Dr. Kapotas concluded that Mr. Bailey's wound was infected and not

healing properly. (Kapotas Dep. 25, 85).

28.     Davis and Dr. Kapotas then had Mr. Bailey transferred to the emergency

room at Stroger Hospital because Cermak did not have the capability to provide Mr.

Bailey with the surgery he needed. (Bailey Dep. 30; Kapotas Dep 25; Davis Dep. 42).

29.     According to Dr. Yu, if an individual with a wound does not receive

adequate care for his wound, osteomyelitis can develop. (Yu Dep. 82-83). According to

Dr. Yu, there was no indication in the Cermak admission records that Mr. Bailey had

osteomyelitis when he arrived at Cermak. (Yu Dep. 81).

30.     According to Dr. Kapotas, if Mr. Bailey's leg dressing was not changed at

Cermak, then his condition could worsen. (Kapotas Dep. 163-64).

31.     According to Dr. Yu, during the time period from when he first examined

Mr. Bailey until August 31, his wound changed from being typical to not typical, and he

believes that something happened during this period that resulted in this change to Mr.

Bailey's wound. (Yu Dep. 167-68)

32.     Dr. Yu admitted that Mr. Bailey's wound became necrotic at some point

before August 30. He also stated that if necrotic wound is not treated, it can lead to

osteomyelitis—the condition Mr. Bailey suffered from. (Yu Dep. 175-76).

33.     Mr. Bailey had x-rays taken of his leg on August 14, 2006. In the x-ray

report, there was no indication of any swelling to his leg. According to Dr. Kapotas,

this meant that there were no signs of infection at that time. (Kapotas Dep. 116).

34.     A little more than two weeks later, on August 31, 2006, more x-rays were

taken of Mr. Bailey's leg. In the report of these second x-rays, there is evidence of

"significant swelling." (Yu Dep. 192-94 and Yu Dep. Exh. 10, Bates No. 803). According

to Dr. Kapotas, this swelling indicates that an infection had developed during the 17-

day period since the first x-rays, and sometime after the cast was placed on Mr. Bailey's

leg. (Kapotas Dep. 106-07, 116). Dr. Yu admits that Mr. Bailey's wound ulcerated during

the period from August 14th to August 31st. (Yu Dep. 297-98).

35.     According to Dr. Edelman, the records from Stroger Hospital

documenting Mr. Bailey's surgery on September 1 indicate that Mr. Bailey had a

significant bacterial infection. (Edelman Report pp. 2-3).

36.     From September 1, 2006 through February 14, 2007, the date of Mr.

Bailey's amputation, he was shuttled back and forth from Cermak to the RTU to Stroger

Hospital. (See Defendants' Statement of Facts at ¶¶ 40-58). Throughout this period, Mr.

Bailey was always in pain. (Bailey Dep. 79; Bailey Declaration ¶ 8).

37.     According to Mr. Bailey, every time he returned to Cermak, he had problems getting his medication, and his wound was not cleaned. (Bailey Dep. 31). In fact, the hole in his leg got larger at Cermak, and on occasions he had to change his own dressings. (Bailey Dep. 94, 97-98).

38.     In late December 2006, while at Cermak, he woke up with blood and pus everywhere so he was transferred back to Stroger, where he remained until his leg was amputated. (Bailey Dep. 116-17).

39.     In the middle of January 2007, Dr. Kapotas raised the issue of amputation with Mr. Bailey. (Bailey Dep. 124). According to Dr. Kapotas, "an amputation is necessary in the situation if tibial infection is—*only if the patient is about to die from the infection*." (Kapotas Dep. 19; emphasis added).

40.     Kapotas believes that when he discussed the possibility of an amputation with Mr. Bailey, he told Mr. Bailey that there was the "potential" his infection could spread and kill him. (Kapotas Dep. 181). He also admitted that a patient with osteomyelitis can die from it if not treated properly. (Kapotas Dep. 182).

41.     According to Mr. Bailey, one of the physicians treating him told him that if he did not agree to the amputation, his infection could get into his bloodstream and he could die. (Bailey Dep. 221). This physician also told Mr. Bailey that they had to amputate because they couldn't do anything else. (Bailey Dep. 224) Accordingly, Mr. Bailey felt he had no choice but to have the amputation. (Bailey Dep. 227).

42.     On February 14, 2007, Dr. Kapotas amputated Mr. Bailey's leg. (Kapotas Dep. 200-01).

43. According to Dr. Edelman, there was a complete failure to care for Mr. Bailey's wound during his first stint at Cermak, and this failure of care caused a significant infection to develop at the wound site. Had Mr. Bailey received even minimal wound care, it is belief that, more likely than not, Mr. Bailey's infection would not have developed to the point where an amputation was deemed necessary. Typically, in his experience with open fracture cases, an amputation is performed generally due to a failure to control an infection associated with the fracture site. It is also his opinion that the casting of Mr. Bailey's leg contributed to the progression of his infection because the wound could not be examined or treated. (Edelman Report p. 3).

44. In 2007, the Civil Rights Division of the U.S. Department of Justice (the "DOJ") conducted an investigation into the conditions at Cook County Jail ("CCJ"). In a report dated July 11, 2008 (the "DOJ Report"), the DOJ concluded that "certain conditions at CCJ violate the constitutional rights of inmates." (DOJ Report p. 3).[8]

45. The DOJ Report concludes that "inmates do not receive adequate medical and mental health care . . . [and that] these conditions have resulted in serious harm to CCJ inmates." (DOJ Report p. 3).

---

[8] The DOJ Report is attached hereto as Exhibit H. Plaintiff anticipates that Defendants will challenge the DOJ Report on the grounds that it is hearsay. If so, this argument fails. Under Fed. R. Evid. 803(8), the "reports . . . of public offices or agencies, setting forth (A) the activities of the office or agency . . . or (C) in civil actions and proceedings . . . factual findings made pursuant to authority granted by law" are not hearsay. Furthermore, any challenge to the authenticity of the DOJ Report would be similarly unsuccessful as Dr. Hart acknowledged the accuracy in part of the DOJ Report, and under Fed. R. Evid. 901(b)(7), it is authenticated as a public report.

46.     Among the many medical care problems identified in the DOJ report are: (1) inadequate health assessments; (2) inadequate acute care; (3) inadequate record keeping; (4) inadequate medication administration; (5) inadequate access to medical care; and (6) inadequate quality assurance. (DOJ Report p. 42).

47.     The medical records that DOJ reviewed covered the period from 2006-2007 (Hart Dep. 42),[9] the time period when Mr. Bailey was incarcerated at Cook County Jail and had his leg amputated.

48.     Dr. Avery Hart is the Chief Medical officer of Cermak. (Hart Dep. 13).

49.     Dr. Hart is familiar with the DOJ Report and was involved in the negotiation of an agreed federal court order and the implementation of that order to address the problems identified in the DOJ Report. (Hart Dep. 17-18). The implementation of the order involved "redesigning processes of care to meet the provisions of the agreed order." (Hart Dep. 20).

50.     Dr. Hart admitted he is familiar with the problems at Cermak identified in the DOJ Report. (Hart Dep. 23). Dr. Hart admitted that some of the problems at Cermak identified in the report are accurate. (Hart Dep. 26).

51.     Dr. Hart acknowledged there is "some validity" to the Report's conclusion that there was inadequate recordkeeping at Cermak. (Hart Dep. 44). He admitted that Cermak has had problems with "medical record retrieval." (Hart Dep. 79). In fact, Dr. Hart acknowledged that this problem was "the most fundamental part," and that led to the situation where "it was sometimes difficult to have the records of the patients in the

---

[9] The cited portions of the Hart Deposition are attached hereto as Exhibit I.

same place as the patient's physically located." (Hart Dep. 45). Dr. Hart also stated that "as inmates move from one place to another, it is a fact that sometimes their records did not accompany them." (Hart Dep. 142). Dr. Hart also acknowledged that the "availability of the health record is useful in providing ongoing care to the patient." (Hart Dep. 142).

52.     Dr. Hart also acknowledged the accuracy of the DOJ Report in a number of other areas: medication administration, access to medical care, inadequate medical facilities, inadequate quality assurance, and inadequate health assessments. (Hart Dep. 48-52).

53.     Dr. Hart acknowledged that in some cases patients were not having their scheduled appointments, acute conditions were not monitored, and timely treatment for conditions was not given. (Hart Dep. 92). This delay in treatment is, according to Dr. Hart, "bound to cause problems in their care." (Hart Dep. 93-94).

54.     According to the DOJ Report, one of the specific problems at CCJ involved "patterns of egregious failures of care regarding wound care . . . ." (DOJ Report p. 49).

55.     The DOJ Report refers to an "Aaron B.," whom counsel for Defendants believes refers to Mr. Bailey. (DOJ Report p. 47; Hart Dep. 95).[10] According to the DOJ Report, an orthopedist refused to treat Aaron B. on August 16, 2006 because his medical records were not provided. (Hart Dep. 96). The DOJ Report concludes that "Aaron B.'s

---

[10] According to the DOJ Report, pseudonyms were used to identify inmates and officers listed in the report. (DOJ Report p. 11, n.6).

leg was amputated as a result of a bone infection resulting from CCJ's failure to provide adequate acute care." (DOJ Report p. 47).

56.     Dr. Hart agreed that if an individual was casted at CCJ, it should be documented somewhere, including the date of the procedure and the signature of the person who performed the procedure. (Hart Dep. 80).

57.     Dr. Hart was also aware that with respect to the sick call process—which was the procedure under which detainees in the RTU were required to request medical care—there were individuals who made repeated requests for medical care but did not receive any. (Hart Dep. 147-50).  According to Dr. Hart, there were problems in the procedure for inmates to request medical care—some collection boxes for medical care request forms were missing and some were broken—so the inmates' requests for medical attention would not get to the nurses on a timely basis. (Hart Dep. 218-19).

58.     Dr. Hart admitted that there was never any rebuttal offered by Cook County to the allegations contained in the DOJ Report. (Hart Dep. 85-86, 89, 91).

59.     Cook County Jail lost its accreditation from the National Commission on Correctional Healthcare in 2007 after receiving an accreditation visit in 2006. (Hart Dep. 155). The number one change requested by the Commission was that CCJ create electronic health records so that health records "would always be available at the point of care regarding the inmate's health history." (Hart Dep. 157-58).

60.     According to Dr. Yu, although Cook County Jail does maintain a grievance system, in the infirmary and the RTU, there were generally no grievances filed.  The reason is that because detainees could move freely and approach doctors if

32

they had any problems. In fact, he agreed that patients with grievances did not have to go through a formal process—they could simply approach him if they had complaints. (Yu Dep. 38). Yan admitted that patients with problems do not have to file a formal grievance. (Yu Dep. 43).

61.     Davis and Defuniak agreed with Dr. Yu that filling out grievance forms is not mandatory for detainees. (Davis Dep. 145-46; Defuniak Dep. 57).

62.     According to Mr. Bailey, when he was at the RTU, he asked some Cook County officers to get him a grievance form but he did not get one. (Bailey Dep. 66). He also wrote a complaint on a plain piece of paper and dropped in a box but he got no response.  (Bailey Dep. 68). According to Mr. Bailey, this happened many times (Bailey Dep. 68).

63.     Mr. Bailey didn't appeal one denial of his grievance because they "don't do anything." (Bailey Dep. 188-89).

64.     Mr. Bailey He filed more than thee grievances but believes they were thrown out because no one responded to them. (Bailey Dep. 195-96).

65.     Mr. Bailey filed a grievance about the cast on his leg while he was at RTU but he never heard anything about it. (Bailey Dep. 196-97).

66.     Mr. Bailey also filed a second grievance about the cast on his leg. (198-99).

Respectfully Submitted,
ANTWAIN BAILEY


By:     /s/ Josh M. Friedman
        One of his attorneys


JOSH M. FRIEDMAN
Law Offices of Josh Friedman
53 W. Jackson, Suite 840
Chicago, IL 60604
(312) 886-0277
A.R.D.C. No. 6220313

## CERTIFICATE OF SERVICE

I, Josh Friedman, attorney for Plaintiff, hereby certify that I served a copy of the foregoing **Plaintiff's 56.1 Statement** by this Court's ECF system on all counsel of record on this 4th day of August, 2011:


/s/Josh Friedman