UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ANTWAIN BAILEY, | ) | |
| | ) | |
| Plaintiff, | ) | 08 C 4441 |
| | ) | |
| v. | ) | Judge George M. Marovich |
| | ) | |
| THE CITY OF CHICAGO, et al, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

After losing part of his leg to amputation, plaintiff Antwain Bailey ("Bailey") filed suit

seeking relief under § 1983 against dozens of defendants. The four remaining defendants–Cook

County, Dr. James Kapotas ("Dr. Kapotas"), Barbara Davis ("Davis") and Dr. Yu Yan ("Dr.

Yu")–move for summary judgment. For reasons set forth below, the Court grants the motion.

**I.     Background**

Unless otherwise noted, the following facts are undisputed.[1]

---

[1]Local Rule 56.1 outlines the requirements for the introduction of facts parties would like considered in connection with a motion for summary judgment. The Court enforces Local Rule 56.1 strictly. Facts that are argued but do not conform with the rule are not considered by the Court. For example, facts included in a party's brief but not in its statement of facts are not considered by the Court because to do so would rob the other party of the opportunity to show that such facts are disputed. Where one party supports a fact with admissible evidence and the other party fails to controvert the fact with citation to admissible evidence, the Court deems the fact admitted. *See Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 817-818 (7th Cir. 2004). This, of course, does not absolve the party putting forth the fact of its obligation to support the fact with admissible evidence. See *Keeton v. Morningstar, Inc.*, __ F.3d __, 2012 WL 130456, slip op. at 2 (7th Cir. 2012). It is not enough at the summary judgment stage for either party to *say* a fact is disputed. The Court considers a fact disputed *only* if both parties put forth admissible evidence of his or its version of the fact. Asserted "facts" not supported by deposition testimony, documents, affidavits or other evidence admissible for summary judgment purposes are not considered by the Court.

The events that led to Bailey's losing his leg began on August 7, 2006. That night, Bailey drove a motorcycle into a Chicago Police Department squad car and was thrown from the motorcycle onto the cement. When he hit the ground, Bailey's tibia and fibula fractured, broke through his soft tissue and skin and were exposed to the air. The police officers arrested Bailey (for, among other things, possession of a stolen motor vehicle) and transported him to Christ Hospital.

Bailey stayed at Christ Hospital until August 11, 2006. During that time, he received medical treatment for his injuries. For example, on August 7, 2006, Bailey underwent a surgical procedure to irrigate his wound and to insert a metal rod into his tibia from his knee to his ankle. On August 9, 2006, Bailey underwent an irrigation and debridement, which is to say that dead tissue was removed from his wound. The parties dispute whether, at the time of that surgery, evidence of infection was present at the wound site. Before Bailey left Christ Hospital, his leg was placed in a soft wrap and a splint. On August 11, 2006, Christ Hospital discharged Bailey with instructions to take Keflex (an antibiotic), to take a narcotic for pain, to keep his leg dry and elevated, to keep the dressing on until August 16, 2006 and to change the dressing on August 16.

Bailey's next stop was Cermak Health Services ("Cermak"), which is the health-care facility that provides care to Cook County's detainees. All detainees who arrive at Cook County Department of Corrections from an outside hospital stop first at the Cermak emergency room, and Bailey was no exception. At admission, Bailey told the nurse he was having level-ten pain. At admission, medical personnel (their identities are not in the record) reviewed Bailey's records from Christ Hospital and wrote Bailey a prescription for: (1) Keflex, (2) Tylenol 3, (3) Bailey's leg dressing to remain intact until August 16, 2006, and (4) Bailey to be seen by a doctor on August 14, 2006.

Bailey was admitted to Cermak's infirmary. The infirmary is where Cook County houses detainees who need acute care, i.e., individuals who have just left the hospital, need intravenous antibiotics or dialysis or have other special needs. As of August 2006, defendant Dr. Yu was the physician in charge of the infirmary. Dr. Yu was responsible for the treatment of detainees in the infirmary and he checked to see that every patient was receiving adequate care. Dr. Yu was also responsible for deciding when a detainee was ready to be moved to the Residential Treatment Unit ("RTU"–more on that later) or back into the general population.

Bailey stayed in the infirmary until August 15, 2006. During that time, Bailey was given his medication and was examined by medical staff. While at the infirmary, Bailey did not experience any loss of feeling in his leg or any drainage from his wound site.

Dr. Yu examined Bailey on August 14, 2006. On that date, Dr. Yu ordered x-rays and prescribed that Bailey use crutches instead of a wheelchair in order to prevent a blood clot from forming in Bailey's leg. The x-rays showed no swelling, which means there were no signs of infection in Bailey's leg at that time. The next day, Tuesday, August 15, 2006, Dr. Yu discharged Bailey to the RTU. The reason Dr. Yu discharged Bailey to the RTU was that Bailey now required only medication and crutches and, thus, no longer needed the acute care provided by the infirmary. When Bailey was discharged, Dr. Yu prescribed Keflex, Motrin and crutches. Finally, Dr. Yu referred Bailey to the orthopedic clinic for a consultation.

Cermak's orthopedic clinic was staffed (by a physician, a physician's assistant and an orthopedic technician) on Wednesdays and Thursdays. On Wednesdays, the orthopedic clinic was staffed by Dr. Alan Malk and physician's assistant Harry Preskopf. On Thursdays, the orthopedic clinic was staffed by Dr. Kapotas and physician's assistant Davis. On Tuesday, August 15, when Dr. Yu filled out a referral form for Bailey to be seen at the orthopedic clinic, Dr. Yu wrote that the request was "urgent," because Dr. Yu wanted to ensure that Bailey would

be seen that week, rather than having to wait until the Wednesday or Thursday of the following week.

Bailey was housed at the RTU from August 15, 2006 until August 31, 2006. The RTU was an area where Cook County housed detainees who needed an intermediate level of medical care. The RTU was a series of large rooms (called tiers), each housing 30 detainees and one correctional officer. Detainees in the RTU were free to move about their tier and the rest of the RTU. In the RTU, detainees saw doctors and physician's assistants by appointment, not every day. During his stay at the RTU, Bailey received medication. None of the remaining individual defendants (Dr. Kapotas, Dr. Yu and Davis) worked in the RTU while Bailey was housed there, and none were responsible for his medical care while he was in the RTU.

Due to Dr. Yu's referral, Bailey was seen in the orthopedic clinic on Wednesday, August 16, 2006. It is undisputed that orthopedic technicians put a hard cast on Bailey's leg. Bailey put forth evidence that Davis helped put on the cast, but defendants put forth evidence that Davis was neither at the clinic on that day nor involved with casting Bailey's leg. Before the hard cast was put on Bailey's leg, the dressing was not changed. It is undisputed that Bailey did not see a physician at the orthopedic clinic on August 16, 2006. A consultation form suggests that Bailey's chart and records were not available at the orthopedic clinic on that date.

After Bailey had been housed at the RTU for about a week, he started to lose feeling in the toes of his injured leg. A couple of days later, he began noticing a smell coming from his wounded leg. Eventually, the smell was, as Bailey described it, "horrible" and like "spoiled meat." Bailey filled out a request to see a doctor but did not see one. Although Bailey was receiving medication, he requested additional medication from the guards. Bailey complained to guards and requested that he be allowed to see a doctor.

Bailey was finally seen by a doctor, Dr. DeFuniak (an attending physician in the RTU), on August 30, 2006. Defendants put forth evidence that Bailey told Dr. DeFuniak that he had gotten his cast wet. Bailey disputes this. Bailey put forth evidence that his cast was wet from discharge from his wound. Either way, Dr. DeFuniak noticed the wet cast and foul odor and referred Bailey to the orthopedic clinic to have the cast removed and the wound looked at.

The next day, when Dr. DeFuniak realized that Bailey had not been seen in the orthopedic clinic, he again referred Bailey to the orthopedic clinic. Later that day (Thursday, August 31, 2006), Dr. Kapotas and Davis saw Bailey in the orthopedic clinic. It is undisputed that that was the first time Dr. Kapotas saw Bailey. The parties dispute whether it was the first time Davis saw Bailey: defendants put forth evidence that it was and Bailey put forth evidence that he had seen her before. Davis removed Bailey's cast and noticed a foul odor and necrotic tissue. She believed Bailey should be transferred to Stroger Hospital. After Davis removed the cast, Dr. Kapotas examined Bailey's leg. Dr. Kapotas noticed an apparent infection at the wound site and concluded that Bailey needed irrigation and debridement surgery. (Dr. Kapotas also ordered x-rays, which confirmed swelling.) Dr. Kapotas transferred Bailey to Stroger Hospital, because the surgery Bailey needed could not be performed at Cermak. Dr. Kapotas referred Bailey to the emergency room at Stroger so that he would be admitted more quickly, and Dr. Kapotas called ahead to the orthopedic specialist at Stroger to ensure that Bailey would be admitted.

At Stroger Hospital, on September 1, Bailey had irrigation and debridement surgery, during which his wound was cleaned, debrided and inserted with antibiotic beads. Bailey was diagnosed with osteomyelitis, a bone infection caused by exposure to bacteria. Once osteomyelitis sets into one's bone, the bacteria remains there for the person's life.

Bailey was at Stroger Hospital from August 31, 2006 through October 9, 2006. While there, he was treated with, among other things, antibiotics, surgeries, dressing changes and a wound vac. Bailey was discharged back to Cook County Department of Corrections on October 9, 2006, where he was cared for until October 31, 2006. Then, Bailey went back to Stroger Hospital for more irrigation and debridement. Bailey remained a patient at Stroger Hospital for the vast majority of the time until February 2007.

In February 2007, Bailey discussed his options with Dr. Kapotas. Dr. Kapotas told Bailey that he had three options: more irrigation and debridement surgeries, bone transport or amputation. Bailey was frustrated with the multiple hospital stays and surgeries. He wanted a treatment that would guarantee that osteomyelitis would not return. Dr. Kapotas told Bailey that only amputation would guarantee that the infection would not return. Later, Bailey told Dr. Kapotas that he was considering amputation. Dr. Kapotas reminded Bailey that amputation is final and that he had other options. Another doctor, Dr. Gray (who is not a defendant) told Bailey that if he did not have an amputation, the infection could get into his blood stream and cause his death. Bailey felt that he had no choice but amputation. Bailey signed a consent form that outlined the amputation procedure and treatment alternatives. Dr. Kapotas amputated Bailey's right leg below the knee.

It is undisputed that the medical evidence indicates that the most likely cause of Bailey's osteomyelitis was the open fracture he suffered during the August 6 motorcycle accident. Bailey also put forth disputed evidence that, had Bailey received better wound care, his infection would not have developed to the point where amputation was necessary.

On July 11, 2008, the Department of Justice ("DOJ") sent the Cook County Board a letter outlining the DOJ's conclusions of an investigation it conducted at the Cook County Department of Corrections. The letter stated its conclusions that, among other things, Cook County

Department of Corrections provided inadequate health assessments, inadequate acute care, inadequate access to medical care and kept inadequate medical records.

Dr. Avery Hart, the Chief Medical Officer at Cermak, testified that he was familiar with the DOJ letter. According to Dr. Hart, at least some portions of the DOJ letter are accurate. Dr. Hart testified that Cermak had problems with the retrieval of medical records and that sometimes patients were one place in Cermak while their records were elsewhere. Dr. Hart also testified that there was some validity to the DOJ letter with respect to medical administration, access to medical care, inadequate medical facilities, inadequate quality assurance and inadequate health assessments.

Bailey filed suit. He alleges that Dr. Kapotas, Davis and Dr. Yu violated his Eighth Amendment right to be free from the infliction of cruel and unusual punishments by being deliberately indifferent to his serious medical needs. Against Cook County, plaintiff asserts a *Monell* claim.

## II.    **Summary judgment standard**

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When making such a determination, the Court must construe the evidence and make all reasonable inferences in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Summary judgment is appropriate, however, when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a

verdict for that party." *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).

**III.**   **Discussion**

    **A.**   **Defendants' objection to the admissibility of the DOJ letter**

In opposition to defendants' motion for summary judgment, Bailey proffered a 97-page letter (the "DOJ letter") to Sheriff Tom Dart and then-President of the Cook County Board Todd Stroger from Acting Assistant Attorney General Grace Chung Becker and United States Attorney for the Northern District of Illinois Patrick Fitzgerald.  The letter is dated July 11, 2008, and it outlines the results of an investigation the DOJ conducted pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA").  The letter stated its conclusions that, among other things, Cook County Department of Corrections provided inadequate health assessments, inadequate acute care, inadequate access to medical care and kept inadequate medical records.

The letter also described treatment provided to particular detainees, each of whom was given a pseudonym.  One such detainee, called "Aaron B.," was similar to Bailey in that he had had his leg amputated due to a bone infection.  Like Bailey, Aaron B. was a detainee in August 2006, but several other details about Aaron B. were different, such as the dates he was housed at various locations.

Defendants argue that the DOJ letter is inadmissible hearsay in that it does not fall within the exception outlined in Rule 803(8) of the Federal Rules of Evidence and, even if it is not hearsay, the probative value is outweighed by the danger of unfair prejudice.

Rule 803(8) of the Federal Rules of Evidence lists as an item not excluded by the hearsay rule:

> A record or statement of a public office if: (A) it sets out: . . . (iii) in a civil case . . . factual findings from a legally authorized investigation; and (B) neither the source of information nor other circumstances indicate a lack of trustworthiness.

Fed.R.Evid. 803(8). Defendants point out that the letter was prepared in anticipation of litigation, that the letter was based on unsworn statements and that Cook County had no opportunity to respond before the letter was sent.

The Court first concludes that any statements in the DOJ letter about Aaron B. are inadmissible. Even if the statements are not hearsay, Bailey provides no evidence that "Aaron B." is really him. This means the evidence has no probative value. Even if it were clear that "Aaron B." were Bailey, the Court would still exclude the statements about Aaron B., because they fail to meet the requirements of Rule 803(8). The very fact that there are discrepancies between what the DOJ letter says about Aaron B. and what the undisputed, sworn testimony submitted to this Court says about Bailey is an indication that the statements about Aaron B. in the DOJ letter lack trustworthiness.

Bailey also seeks to use the DOJ letter as proof of the DOJ's conclusions, i.e., to prove Cook County Department of Corrections provided inadequate health assessments, inadequate acute care, inadequate access to medical care and kept inadequate medical records. The Court agrees with defendants that the DOJ letter is inadmissible to establish the truth of those matters. As defendants point out, the DOJ letter was prepared in anticipation of a lawsuit that, in the DOJ letter, the DOJ threatened to file. (DOJ letter at 97) ("We are obligated to advise you that, in the event that we are unable to reach a resolution regarding our concerns, the Attorney General may initiate a lawsuit pursuant to CRIPA . . ."). In addition, the DOJ did not conduct an evidentiary hearing. Instead, the DOJ letter appears to be based on unsworn interviews, and Cook County

was not given an opportunity to respond before the DOJ letter was sent. Accordingly, the DOJ letter strikes the Court as being more like advocacy and less like neutral fact-finding.

Bailey has not established that the DOJ letter falls within Rule 803(8), and defendants' objection to its admissibility is sustained. Of course, the DOJ letter can still be used as evidence of the fact that the Cook County Board was notified of the DOJ's conclusions.

### B. Bailey's Eighth Amendment Claim against the individual defendants

Bailey seeks relief under 42 U.S.C. § 1983 against defendants Dr. Kapotas, Dr. Yu and Davis for alleged violation of his eighth amendment right to be free from cruel and unusual punishments.[2] Pursuant to §1983, one may bring suit against any person who caused a violation of his constitutional rights under color of state law. 42 U.S.C. § 1983; *Berry v. Peterman*, 604 F.3d 435, 439 (7th Cir. 2010).

Although the constitution does "not mandate comfortable prisons," it does prohibit cruel and unusual punishments, which, among other things, means that prison officials must provide adequate medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal citations omitted). To violate the Eighth Amendment prohibition on cruel and unusual punishments, a prison official must have acted with deliberate indifference. To establish his claim against each individual defendant, Bailey must show: "(1) that he suffered from an objectively serious medical condition; and (2) that the individual defendant was deliberately indifferent to that

---

[2]Because plaintiff was a pre-trial detainee, his claim is actually a Fourteenth Amendment claim, but the standard is the same. *Williams v. Rodriguez*, 509 F.3d 392, 401 (7th Cir. 2007) ("Although the Eighth Amendment only applies to convicted prisoners, this court has previously stated that the same standard applies to pretrial detainees under the Fourteenth Amendment's due process clause.").

condition." *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010). The Supreme Court defined deliberate indifference in *Farmer v. Brennan*, where it said:

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer v. Brennan*, 511 U.S. at 837. Thus, neither negligence nor malpractice constitutes a violation of the constitution. *See Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) ("Evidence that the official acted negligently is insufficient to prove deliberate indifference."); *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008) ("Deliberate indifference is not medical malpractice; the Eighth Amendment does not codify common law torts.").

Bailey asserts that each individual defendant caused a violation of his Eighth Amendment right to be free from cruel and unusual punishments. Each individual defendant moves for summary judgment, and the Court considers each defendant, in turn.

### 1. Dr. Kapotas

In Count I of his third-amended complaint, Bailey alleges that Dr. Kapotas refused to provide Bailey medical treatment and refused to perform an orthopedic consultation of Bailey's leg on August 16, 2006. Dr. Kapotas moves for summary judgment on this claim.

Dr. Kapotas argues that he was not deliberately indifferent to Bailey's medical needs. First, Dr. Kapotas put forth undisputed evidence that he was not working in the orthopedic clinic on August 16, 2006 and, therefore, could not have refused to treat Bailey on that day. Next, Dr. Kapotas argues that when he finally saw Bailey on August 31, 2006, Dr. Kapotas immediately referred him to Stroger Hospital for urgent care. Plaintiff did not respond to Dr. Kapotas's

argument that he was not deliberately indifferent and appears to be conceding that Dr. Kapotas was not deliberately indifferent.

The Court agrees that Dr. Kapotas was not deliberately indifferent to Bailey's medical needs. It is undisputed that Dr. Kapotas, who staffed the orthopedic clinic only on Thursdays, was not working in the orthopedic clinic on August 16, 2006.

Although Dr. Kapotas was not working at the orthopedic clinic on August 16, 2006, he was working in the orthopedic clinic on August 31, 2006. Due to a referral by Dr. DeFuniak, Bailey was taken to the orthopedic clinic on August 31, 2006. He was first examined by Davis, who removed his cast and noticed a foul odor and necrotic tissue. After the cast was removed, Dr. Kapotas examined Bailey. Dr. Kapotas noticed an apparent infection and decided that Bailey needed irrigation and debridement surgery. Dr. Kapotas referred Bailey to the emergency room of Stroger Hospital (where Bailey had the surgery the very next day) and called ahead to the orthopedic specialist at Stroger Hospital to ensure that Bailey would be admitted. The undisputed evidence makes clear that the very first time Bailey was referred to see him, Dr. Kapotas took action to obtain the necessary medical treatment for Bailey.

As a matter of law, Dr. Kapotas was not deliberately indifferent to Bailey's needs, and he is entitled to judgment as a matter of law with respect to Bailey's claim (Count I) against him. Dr. Kapotas is granted summary judgment on Count I.

## 2. Davis

In Count I, Bailey also alleges that physician's assistant Davis was deliberately indifferent to his medical needs on August 16, 2006.

Davis moves for summary judgment. She argues that she was not working in the orthopedic clinic on August 16, 2006 and that the first time she saw Bailey was on August 31, 2006. Were those facts undisputed, her motion would be granted for the same reasons as was Dr. Kapotas's motion. Those facts, however, are disputed. As Bailey points out, he put forth evidence that Davis assisted an orthopedic technician in putting a hard cast on his leg at the orthopedic clinic on August 16, 2006 without changing the dressing on his wound. Bailey believes that if a cast had not been placed on his leg, then his wound would not have become infected and he would not have had his leg amputated. Bailey also takes issue with the fact that Davis did not check on him after the cast was placed on his leg.

Even crediting Bailey's version of the facts, Bailey still has not put forth evidence from which a reasonable jury could conclude that Davis knew of and disregarded an excessive risk to inmate health or safety, i.e., that she was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and that she drew the inference. It is undisputed that x-rays taken August 14, 2006 showed no swelling or signs of infection at Bailey's wound site. Although the instructions from Bailey's release from Cermak stated that the dressing should be changed on August 16, 2006, it is undisputed that Bailey's medical records were not available at the orthopedic clinic on that date. Thus, there is no evidence that Davis knew that the dressing should be changed before the leg was put in a cast or that the cast would otherwise cause Bailey problems. At best, Davis's conduct in casting Bailey's leg would constitute negligence or medical malpractice, not deliberate indifference.

Plaintiff also argues that Davis should have kept tabs on him once he left the orthopedic clinic and was sent back to the RTU. Davis's job, however, was to staff the orthopedic clinic

once per week.  Plaintiff does not say why Davis had a duty to check up on him after he left the orthopedic clinic, but a breach of such duty would constitute negligence, not deliberate indifference.  Once Bailey was referred back to the orthopedic clinic on August 31, 2006, Davis removed his cast.  Once the cast was removed, Dr. Kapotas referred Bailey for emergency treatment.

Bailey has not put forth evidence from which a reasonable jury could conclude that Davis was deliberately indifferent to his serious medical condition.  Accordingly, Davis is entitled to judgment as a matter of law on Bailey's claim (Count I) against her.  Davis is granted summary judgment on Count I.

### 3.    Dr. Yu

Next, Bailey seeks to hold Dr. Yu liable.  Dr. Yu moves for summary judgment arguing that the facts do not suggest that he was deliberately indifferent.

The Court agrees that Bailey has not put forth evidence from which a reasonable jury could conclude that Dr. Yu was deliberately indifferent to Bailey's medical needs.  It is undisputed that, in August 2006, Dr. Yu was the primary care physician in Cermak's infirmary. He was responsible for the treatment of detainees in the infirmary and for deciding when they should be moved to the RTU (Residential Treatment Unit).  Bailey was housed at the infirmary from the time he was released from Christ Hospital on August 9, 2006 until he was released to the RTU on August 15, 2006.  During that time, Bailey received his medication and was examined by medical staff.  Bailey did not experience any loss of feeling in his leg or drainage from the wound site during his stay in the RTU.  Dr. Yu examined Bailey on August 14, 2006. Dr. Yu ordered x-rays (which, ultimately, showed no swelling) and prescribed that Bailey use

crutches (rather than his wheelchair) to prevent blood from clotting in his leg. The next day, Dr.

Yu discharged Bailey to the RTU, because Bailey needed only medication and crutches. When

he discharged Bailey, Dr. Yu prescribed Keflex and Motrin. Dr. Yu also referred Bailey for an

orthopedic consult. None of these facts suggest that Dr. Yu was deliberately indifferent to

Bailey's needs. Indeed, Bailey does not argue that they do.

Instead, in response to the motion for summary judgment, Bailey argues that Dr. Yu's

liability is supervisory. Bailey's theory seems to be that Dr. Yu knew that there were problems

with the way health care was provided in the RTU and that Dr. Yu sent him there anyway. Dr.

Yu cannot be held liable under § 1983 on a *respondeat superior* theory. *Monell v. Department

of Soc. Serv. of NY*, 436 U.S. 658, 691 (1978). A supervisor is not liable without a showing of

personal responsibility, which means the constitutional violation occurred at his direction or that

he knew about it, condoned it or turned a blind eye to it. *Vance v. Peters*, 97 F.3d 987, 993 (7th

Cir. 1996) (citing *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)). The problem with

Bailey's theory is that there is no evidence to support it. Bailey points to the fact that when Dr.

Yu referred Bailey for an orthopedic consultation, he marked the form "urgent," because,

without that designation, Bailey might not be seen for a week. That is not evidence that Dr. Yu

knew the care at RTU was substandard; it is evidence that Dr. Yu knew the orthopedic clinic was

staffed on Wednesdays and Thursdays and that Dr. Yu, who wrote the referral on a Tuesday, did

not want Bailey to wait until the following week for his orthopedic consultation. Bailey has put

forth no evidence that Dr. Yu knew or turned a blind eye to the fact that a cast was put on

Bailey's leg without changing the dressing. Bailey has put forth no evidence that Dr. Yu knew

or turned a blind eye to the fact that Bailey, after a week in the RTU, started to experience

numbness and started to smell an odor coming from his wounded leg. Bailey has put forth no evidence that Dr. Yu knew or turned a blind eye to the fact that Bailey was asking guards to see a doctor. In short, Bailey has failed to put forth evidence from which a reasonable jury could conclude that Dr. Yu is personally responsible for a violation of Bailey's constitutional rights.

Bailey's experience at the RTU was not a model of excellent health care. About a week after Bailey's leg was put in a cast on August 16, 2006, he began noticing numbness in his toes. A couple of days later, he noticed a faint, foul smell coming from his wounded leg. Eventually, his leg smelled like "spoiled meat." Bailey put forth evidence that he handed to a nurse one written request to see a doctor. He also put forth evidence that he complained to guards but was not allowed to see a doctor until he saw Dr. DeFuniak on August 30, 2006. On that date, Dr. DeFuniak (who is not a defendant) noticed the foul odor and referred Bailey to the orthopedic clinic, where he was seen on August 31, 2006. If someone were deliberately indifferent to Bailey's serious health condition, it was likely the guards in the RTU to whom Bailey complained about the numbness and odor but who did not send Bailey to see a physician until August 30, about a week after he started complaining. None of those guards, however, are defendants in this suit.

The individuals who are defendants in this suit–Dr. Kapotas, Dr. Yu and Davis–are entitled to judgment as a matter of law on Bailey's claim against them and, thus, are entitled to summary judgment on Count I. Defendants' motion for summary judgment as to Count I is granted.

### C.    Bailey's *Monell* claim against Cook County

In Count II, Bailey asserts that defendant Cook County is liable to him under § 1983. In *Monell v. Department of Social Services of New York*, 436 U.S. 658, 692 (1978), the Supreme Court considered the plain language of § 1983 and stated that it "plainly imposes liability on a government that, under color of some official policy, 'causes' an employee to violate another's constitutional rights." *Monell*, 436 U.S. at 692. The policy need not be explicit. A local government can be liable under § 1983 if the "unconstitutional act was caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook Cty.*, 604 F.3d 293, 303 (7th Cir. 2010).

At this point, one would be forgiven for thinking that, because none of the individual defendants violated Bailey's constitutional rights, Cook County would automatically be entitled to summary judgment on the *Monell* claim. *Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("neither [*Monell*] nor any of our cases authorizes an award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm."). The Seventh Circuit has said that such an assumption takes *Heller* too far. The Seventh Circuit has explained:

> The County, in this case, appears to push for a rule that requires individual officer liability before a municipality can ever be held liable for damages under *Monell*. This is an unreasonable extension of *Heller*. What if the plaintiff here had only sued the County, *or didn't know, because of some breakdown in recording shifts, who the CMTs on duty were*? The actual rule, as we interpret it, is much narrower: a municipality can be held liable under *Monell*, even when its officers are not, unless such a finding would create an *inconsistent* verdict.

*Thomas*, 604 F.3d at 305 (emphasis added). Thus, in a case where a constitutional violation was inflicted, if at all, by an individual who is not a defendant, the fact that the named defendants did

not violate plaintiff's constitutional rights does not eliminate the possibility that the County is liable.

The question is whether Bailey put forth evidence from which a reasonable jury could conclude that a constitutional violation was caused by a practice or custom of Cook County. The problem here, as defendants point out, is that Bailey does not say what the constitutional violation was, if it was not Dr. Yu's or Davis's conduct (which, as the Court has ruled, was not unconstitutional). Bailey argues that practices and customs of Cook County caused his leg to be amputated, but he does not say what the constitutional violation is. Yes, he needs an injury in order to sue, but he also needs a constitutional violation. If, while a police officer is handcuffing an arrestee, the arrestee gets knocked over and injured, the arrest caused his injury; but, he only has a § 1983 claim if the officer used excessive force. This Court does not read *Thomas* as eliminating the requirement of a constitutional violation before liability can attach. Here, plaintiff fails to say what that constitutional violation is, but it is not the actions of Dr. Yu or Davis. Nor can it be malpractice or negligence.

In the Court's view, the only constitutional violation for which plaintiff has created a jury issue is whether the guards to whom Bailey complained during his second week in the RTU were deliberately indifferent to his serious medical condition. Plaintiff does not argue that this is the constitutional violation and does not argue that Cook County could be liable for the guards' conduct, in any event. (That probably makes sense. The guards worked for the Sheriff, and plaintiff has already dismissed the Sheriff with prejudice, perhaps due to a settlement.)

Even if Bailey had put forth sufficient evidence of a constitutional violation, he has not put forth enough evidence to hold Cook County liable under *Monell*. A plaintiff may establish a

custom with evidence "of the knowledge of policymaking officials and their acquiescence in the established practice." *McNabola v. Chicago Trans. Auth.*, 10 F.3d 501, 511 (7th Cir. 1993). The Seventh Circuit has also said that the "longstanding or widespread nature of a particular practice would support the inference that policymaking officials 'must have known about it but failed to stop it.'" *McNabola*, 10 F.3d at 511 (citations omitted). In *McNabola*, a white *per diem* independent contractor (who had worked as a medical examiner) filed suit under § 1983 seeking to hold the Chicago Transit Authority liable under *Monell* for the practice of its general counsel, Janet Hughes, of driving out white *per diems* in order to replace them with black *per diems*. In that case, a member of CTA's Board testified that he had served on the committee that heard complaints from aggrieved employees. The Board member testified that after Hughes's appointment as general counsel, the committee received a "crescendo" of complaints–far more than in prior years–most of which were from "very capable" white employees who Hughes had removed. The plaintiff also put forth testimony of the legal division's highest-ranking woman, who testified that Hughes had hired only black *per diem* attorneys and stopped giving assignments to white *per diem* attorneys. There was evidence that the Board knew about Hughes's pattern of hiring only black *per diems* in that Hughes's hiring recommendations had to be approved by the Board or its Chairman. The Seventh Circuit concluded that "[a]lthough this case is very close, we are convinced that the evidence was sufficient for a reasonable jury to conclude that the CTA Board acquiesced in a practice or custom of terminating white *per diems*." *McNabola*, 10 F.3d at 511.

The Seventh Circuit also found sufficient evidence from which a jury could find *Monell* liability based on a custom or practice in *Thomas*. 604 F.3d at 303. In *Thomas*, the mother of a

former pre-trial detainee, Smith, who had perished from meningitis during his week-long stay at Cermak, sought to hold Cook County liable under *Monell*. Plaintiff had put forth evidence that the way detainees obtained medical care was to fill out medical request forms, which were supposed to be collected by Cermak's medical technicians on a daily basis. Plaintiff had also put forth evidence that a number of other detainees had filled out requests for medical care for Smith, because Smith was vomiting and unable to walk for several days. Yet, Smith did not receive medical care. The supervisor of the medical technicians testified that medical request forms were not collected every day at the time of Smith's death due to a number of problems, including (1) that the forms were deposited in a locked box but not all medical technicians had keys and (2) that, due to understaffing, a guard was not always available to allow medical technicians on floors to obtain medical request forms. The Seventh Circuit explained:

> We are not dealing with an isolated act of an individual employee, which would be insufficient to establish a widespread custom or practice. *Monell*, 436 U.S. at 691-94, 98 S.Ct. 2018. Instead, the jury heard a number of County employees, some of whom were policymakers, testify about a practice that went on for an extended period of time.

*Thomas*, 604 F.3d at 303. The Seventh Circuit concluded that, from this evidence, a reasonable jury could conclude that Cook County had a widespread practice of failing to review detainee's medical requests.

Bailey has not put forth sufficient evidence from which a reasonable jury could conclude that Cook County is liable. Unlike in *McNabola*, where the plaintiff put forth evidence that County Board members had approved all of Hughes' unconstitutional hiring decisions, Bailey has not put forth any evidence that the Cook County Board or other policymaking officials knew of and acquiesced in a constitutional violation (which, again, Bailey does not identify). Unlike

in *Thomas* (where the plaintiff put forth evidence that the practice of failing to collect medical request forms went on for an extended period of time) and *McNabola* (where a Board member testified that he had received a "crescendo" of complaints about Hughes's unconstitutional hiring practices), Bailey fails to put forth evidence of a widespread practice. What Bailey has put forth is the fact the DOJ letter was sent on July 11, 2008 and Dr. Hart's admission that there was "some validity" to the DOJ letter with respect to medication administration, access to medical care, inadequate medical facilities, inadequate quality assurance and inadequate health assessments. That testimony is extremely vague and sheds no light on the extensiveness of the problems. If *McNabola* was a "very close case," as the Seventh Circuit described it, this one is not.

Bailey has failed to put forth evidence from which a reasonable jury could conclude that he suffered a constitutional injury caused by a custom or practice of Cook County. For these reasons, Cook County is entitled to judgment as a matter of law. Defendants' motion for summary judgment as to Count II is granted.

**IV.** **Conclusion**

For the reasons set forth above, the Court grants defendants' motion for summary judgment. Case closed.

ENTER:

*George M. Marovich*

George M. Marovich
United States District Judge

DATED:  March 9, 2012